**In the Matter of the WELFARE OF J.W.K., Child.**

**No. CX–97–1696.**

Supreme Court of Minnesota.

Aug. 27, 1998.

Hubert H. Humphrey III, Attorney General, Robert A. Stanich, Assistant Attorney General, St. Paul, Boyd A. Beccue, Kandiyohi County Attorney, Willmar, for Appellant.

Mark D. Nyvold, St. Paul, for Respondent.

## OPINION

BLATZ, Chief Justice.

This is a state's pretrial appeal from a suppression order in a juvenile delinquency proceeding. The juvenile's attorney successfully argued in the district court that the court should suppress both the DNA test results on a blood sample linking the suspect to the crime scene and a confession he gave after being confronted with the identification evidence. The court of appeals affirmed, concluding that the police needed additional consent or, failing that, a new sample obtained pursuant to a search warrant, before using the youth's blood sample in connection with their investigation of what was a different crime than the one contemplated when consent was obtained. *In the Matter of the Welfare of J.W.K., Child,* 574 N.W.2d 103 (Minn.App.1998). We conclude that the Fourth Amendment exclusionary rule does not require suppression of the evidence because even if the police exceeded the scope of the suspect's consent in using his blood sample in connection with the investigation of a different crime, the police inevitably would have obtained a blood sample from the suspect for the use in question. Accordingly, we reverse the decision of the court of appeals affirming the district court's suppression order and remand to the district court for further proceedings.

On October 17, 1996, some golf carts were taken from the Little Crow Country Club in New London and destroyed. Investigators found a stool sample on the scene and a juvenile's detention slip that had been used as toilet paper. Detectives Burns and Friedrich of the sheriff's office, suspected J.W.K. was involved. They went to the boy's resi-

dence and asked for permission to draw blood from the boy so that they could test it against the stool sample apparently left by one of the people involved in the destruction of the golf carts. J.W.K. and his mother both consented to the drawing of the blood. The detectives provided them with a written consent form. The language inserted on the form limits the consent given to the removal of blood to use "to compare against evidence found where one of the golf carts was stored for a short time." The detectives took the boy to a local clinic, where a medical professional removed a sample of blood from him.

Approximately two hours later, one of the suspects in the golf cart incident confessed to being the person who defecated near the golf carts. This person also gave the names of two other individuals who were with him, neither of them being J.W.K. At that point the detectives decided they did not need to use J.W.K.'s blood in their investigation of the golf-cart incident.

Detective Burns held on to the blood sample for awhile and then, upon learning that Detective Hartog was interested in it in connection with an earlier burglary, signed the sample over to him. This earlier burglary had occurred the previous spring. Specifically, on May 27, 1996, the sheriff's department had received and investigated a report of a burglary at a residence on Highway 23 near New London. Among the items recovered from the scene was a blood-spattered mat. Detective Hartog, to whom the case was assigned, had focused his suspicion on J.W.K. after another suspect, S.M., told him J.W.K. was involved. S.M. also told the detective that J.W.K. had a cut on his hand. Subsequently, the deputy also had spoken with a person who wished to remain anonymous, who said that R.S. and J.W.K. committed the burglary along with another individual. The detective then had spoken with J.W.K., who denied involvement in the burglary.

Upon receiving the blood sample from Detective Burns, Detective Hartog sent the sample to the Bureau of Criminal Apprehension crime lab. On March 27, 1997, the bureau reported that the blood sample taken from J.W.K. matched the blood found at the scene of the first burglary.

On April 14, 1997, Detective Hartog, after obtaining the mother's permission, spoke with J.W.K. at the boy's house. The boy at first again denied participating in the burglary. However, after reading the BCA report, which the detective showed him, the boy confessed. He refused to identify the others who were with him.

At the suppression hearing, Detective Burns, the officer who obtained the consent for the removal of the blood, testified that his intent in obtaining the sample was to use it to see if the boy was the source of the stool sample found in connection with the golf-cart incident. Asked, "And is that it?" the detective answered, "And that's it." Both the boy and the mother testified at the suppression hearing that it was their understanding, based presumably on talking with the officer and the clear limiting language on the form, that the blood sample was needed to clear the boy of the golf-cart incident. The boy and the mother agreed that there had been no discussion about possible use of the blood sample for anything else.

The district court reasoned that the consent given by the boy was limited consent and that the police did not have the authority to use the blood sample obtained from the boy to compare it with blood found at the scene of the earlier crime. The court concluded that the boy's confession was the suppressible fruit of the unauthorized, illegal testing of the boy's blood for comparison with the blood found at the scene of the first crime.

The court of appeals affirmed, concluding that the police needed additional consent or, failing that, a new sample obtained pursuant to a search warrant, before they compared the blood with the blood found at the other burglary scene. *In the Matter of the Welfare of J.W.K., Child,* 574 N.W.2d at 105.

■■■ A preliminary question is whether the Fourth Amendment applies, a question clearly answered by the Untied States Supreme Court's decisions in, among other cases, *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639

(1989). In *Skinner,* which dealt with the reasonableness of regulations requiring mandatory blood and urine tests of covered railway employees following certain train accidents or incidents, the Court stated:

> Our precedents teach that where, as here, the Government seeks to obtain physical evidence from a person, the Fourth Amendment may be relevant at several levels. *See, e.g., United States v. Dionisio,* 410 U.S. 1, 8 [93 S.Ct. 764, 35 L.Ed.2d 67] (1973). The initial detention necessary to procure the evidence may be a seizure of the person, *Cupp v. Murphy,* 412 U.S. 291, 294–95 [93 S.Ct. 2000, 36 L.Ed.2d 900] (1973); *Davis v. Mississippi,* 394 U.S. 721, 726–27 [89 S.Ct. 1394, 22 L.Ed.2d 676] (1969), if the detention amounts to a meaningful interference with his freedom of movement. *INS v. Delgado,* 466 U.S. 210, 215 [104 S.Ct. 1758, 80 L.Ed.2d 247] (1984); *United States v. Jacobsen,* [466 U.S. 109, 113, n. 5, 80 L.Ed.2d 85 (1984)]. Obtaining and examining the evidence may also be a search, *see Cupp v. Murphy, supra,* at 295 [93 S.Ct. 2000]; *United States v. Dionisio, supra,* at 8, 13–14 [93 S.Ct. 764], if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable, *see, e.g., California v. Grenwood,* 486 U.S. 35, 43 [108 S.Ct. 1625, 100 L.Ed.2d 30] (1988); *United States v. Jacobsen, supra,* at 113 [104 S.Ct. 1652].

We have long recognized that a "compelled intrusio[n] into the body for blood to be analyzed for alcohol content" must be deemed a Fourth Amendment search. *See Schmerber v. California,* 384 U.S. 757, 767–68 [86 S.Ct. 1826, 16 L.Ed.2d 908] (1966). *See also Winston v. Lee,* 470 U.S. 753, 760 [105 S.Ct. 1611, 84 L.Ed.2d 662] (1985). In light of our society's concern for the security of one's person, *see, e.g., Terry v. Ohio,* 392 U.S. 1, 9 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests. *Cf. Arizona v. Hacks,* 480 U.S. 321, 324–25 [107 S.Ct. 1149, 94 L.Ed.2d 347] (1987). * * * [C]hemical analysis * * * of blood [ ] can reveal a host of private medical facts about [a person], including whether he or she is epileptic, pregnant, or diabetic.

489 U.S. at 616–17, 109 S.Ct. 1402.

■ In the context of a criminal investigation, the general rule is that police, absent consent, may not subject a detained person to the forced removal of blood for scientific testing in the absence of probable cause and either a search warrant authorizing the intrusion or exigent circumstances excusing the need for a search warrant. In *Schmerber, supra,* police investigating an automobile accident developed probable cause to believe that the driver was drunk at the accident scene. The police directed a physician to take a blood sample from the driver despite his refusal on advice of counsel. Subsequently, the results of chemical analysis of the blood, which indicated intoxication, were admitted in evidence at the driver's trial on a DWI charge. Affirming the conviction, the Supreme Court ruled, *inter alia,* that the withdrawal of the driver's blood and admission of the results in evidence did not violate the driver's Fourth Amendment rights because the police had probable cause, because a medical professional withdrew the blood, and because exigent circumstances were present excusing compliance with the warrant requirement. With respect to exigent circumstances, the Court said:

> The officer in the present case * * * might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened "the destruction of evidence," *Preston v. Untied States,* 376 U.S. 364–67 [84 S.Ct. 881, 11 L.Ed.2d 777 (1964)]. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special

facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

Similarly, we are satisfied that the test chosen to measure petitioner's blood-alcohol level was a reasonable one. Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. *See Breithaupt v. Abram,* [352 U.S. 432], at 436. n. 3 [77 S.Ct. 408, 1 L.Ed.2d 448 (1957)]. Such tests are a common place in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain. * * *

384 U.S. at 770–71, 86 S.Ct. 1826.

There clearly were no exigent circumstances justifying a warrantless forced removal of blood in this case. Unlike alcohol in the blood, which declines in percentage over a period of time, the DNA profile present in one's blood stays the same from day to day. There being no exigent circumstances, absent consent, the police in this case would have had to obtain a warrant to obtain a blood sample.

The officers investigating one of the two crimes did obtain consent from the boy to the removal of a blood sample for DNA profiling in connection with the golf-cart incident. The issue is whether, upon deciding that the boy probably was not involved in the golf-cart incident, the officers violated the boy's Fourth Amendment rights in submitting the blood sample for DNA profiling in connection with the other crime without first asking for and obtaining the boy's permission.

The attorney for the boy makes a strong argument that the police did not have any authorization from the boy and his mother to use the blood sample to compare the blood with blood found at the other crime scene. The general issue of scope of consent in various contexts is addressed at 3 Wayne R. LaFave, *Search and Seizure* § 8.1(c) (3 ed.1996). However, we do not decide this issue because it is not necessary to do so. It is not necessary to do so because the

Fourth Amendment exclusionary rule does not require the suppression of the blood test results and the confession obtained after informing the boy of the results. Stated differently, on the facts of this case, the inevitable discovery exception to the Fourth Amendment exclusionary rule applies.

■ The leading decision of the United States Supreme Court dealing with the inevitable discovery exception is *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). As the Court made clear in that case, the rationale of the exclusionary rule is that "the prosecution is not to be put in a better position than it would have been if no illegality had transpired." *Id.* at 443, 104 S.Ct. 2501. Conversely, the purpose of the exclusionary rule is not to put the police in a worse position. *Id.* at 443, 104 S.Ct. 2501. The rationale of the inevitable discovery exception, like that of the so-called independent source doctrine, is that exclusion of evidence that would inevitably have been discovered would put the prosecution in a worse position "because the police would have obtained the evidence if no misconduct had taken place." *Id.* at 444, 104 S.Ct. 2501. See also 5 Wayne R. LaFave, *Search and Seizure* § 11.4(a) (3 ed.1996).

Of the relevant decisions of this court, the one that is most relevant is *State v. Eppler,* 362 N.W.2d 315 (Minn.1985). There the defendant argued that the district court should have suppressed the eyewitness identification testimony because, *inter alia,* a police officer broke an agreement to let the defendant's attorney preview the photographic display and be present when the pictures were shown to the witnesses. This court stated:

There is authority for the proposition that if the police have no other basis to conduct a search than the defendant's consent, then the police must abide by any limitation by the defendant on the scope of that consent. [Citation to earlier edition of LaFave's treatise]. In this case, however, the officer had probable cause to believe that defendant was guilty of shoplifting and therefore he could have arrested her and taken pictures of her immediately. Stated differently, the officer did not need

defendant's consent. Thus, his failure to abide by the terms of the agreement should not render the identification evidence inadmissible.

Further, as a matter of Fourth Amendment law, even if the police illegally arrest a person, take that person's picture, and then show the picture to an eyewitness, the eyewitness' identification need not be excluded pursuant to the federal exclusionary rule if a photograph of the person inevitably would have been obtained through lawful means and shown to the eyewitness. *Nix v. Williams,* 467 U.S. 431 [104 S.Ct. 2501, 81 L.Ed.2d 377] (1984); *State v. Seefeldt,* 292 N.W.2d 558, 560 (Minn.1980). In this case, even assuming hypothetically that the police could not properly arrest defendant and obtain her picture that way, it appears inevitable that the police would have obtained a picture of her through independent means, would have shown that picture to the eyewitnesses, and would have obtained the eyewitness identification evidence. *State v. Seefeldt,* 292 N.W.2d at 560.

362 N.W.2d at 317.

If the police in this case had not submitted the sample in question for DNA profiling in connection with the other offense, because they presumed they did not have the authorization or consent of the boy and the mother, they presumably would have tried to obtain the permission of the boy and the mother to submit the previously-obtained sample for DNA profiling in connection with the other offense. If they had obtained his permission, presumably they would have sent the previously-obtained sample to the BCA for DNA profiling, which would have connected the boy to the crime in question. This is because unlike alcohol in the blood, which declines in percentage over a period of time, the DNA profile present in one's blood stays the same from day to day.

If, on the other hand, the boy and his mother had refused permission to subject the previously-obtained sample to DNA profiling in connection with the other offense, the police presumably would have sought and obtained a warrant authorizing either the taking of a new sample or the submission of the previously-obtained sample to the BCA for DNA profiling. We have already summarized the information that Detective Hartog had connecting the boy to the other offense. We believe that that information was sufficient to establish probable cause to search.

Because application of the inevitable exception discovery precludes the suppression of the DNA profile evidence in this case, we do not believe there is any problem with the admissibility of the confession.

In summary, we need not decide whether the police exceeded the scope of consent in using the suspect's blood sample in connection with the different investigation than the one contemplated when the consent was obtained. Even assuming that the police violated the juvenile's Fourth Amendment rights in using the evidence as they did, suppression of the evidence, including the confession that was obtained, is not required because the record is sufficient to establish that the police inevitably would have obtained a blood sample from the suspect for the use in question.

Reversed and remanded to the district court for further proceedings.