# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A14-0432

State of Minnesota,
Respondent,

vs.

Kyle Dean McClain,
Appellant.

**Filed May 4, 2015**
**Reversed and remanded**
**Cleary, Chief Judge**
**Concurring specially, Ross, Judge**

St. Louis County District Court
File No. 69DU-CR-13-701

Lori Swanson, Attorney General, Michael Everson, Assistant Attorney General, St. Paul, Minnesota; and

Mark Rubin, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota; and

Peter J. Farrell, Special Assistant Public Defender, Faegre Baker Daniels LLP, Minneapolis, Minnesota (for appellant)

Considered and decided by Reilly, Presiding Judge; Cleary, Chief Judge; and Ross, Judge.

## S Y L L A B U S

The inevitable-discovery exception to the exclusionary rule is limited to physical evidence and does not apply to statements obtained after an unlawful search.

# O P I N I O N

**CLEARY**, Chief Judge

The state charged appellant with first- and second-degree assault. Before trial, appellant moved to suppress a statement that he gave after a warrantless entry. The district court suppressed appellant's statement, but allowed it to be used for purposes of impeachment. During trial, the district court reversed the suppression order and admitted appellant's statement as substantive evidence under the inevitable-discovery doctrine. The state subsequently utilized the statement for impeachment purposes and as substantive evidence. The jury convicted appellant and this appeal followed. Because the inevitable-discovery doctrine does not apply to statements and because the district court committed prejudicial error in allowing the statement to be admitted as substantive evidence, we reverse and remand for a new trial.

## FACTS

On February 18, 2013, around 10:15 p.m., Duluth police responded to a call from the Duluth detoxification center regarding a stabbing. The victim had a stab wound to the chest. The police identified the victim, but he was unable to coherently respond to police questions.

While several officers treated the victim, other officers attempted to locate where the stabbing had occurred. The officers were not able to recover any information from the victim initially, so Officer Dan Neitzel began searching the victim's history in department computer records to see if he had any known addresses. Officer Neitzel

found that the victim was associated with 1027 East Third Street. Officer Neitzel went to that address with another officer and discovered drops of blood at the "northwest corner of th[e] intersection just before the sidewalk." Officer Neitzel followed a trail of blood leading to the sidewalk in front of 1027 East Third Street and testified that it appeared to come from one source. Several officers then knocked on the door to see if anyone was inside. No one responded. Officer Neitzel stated that he believed that there could have been other individuals inside the apartment who were injured during the victim's stabbing because of the large amount of blood outside.

Officer Neitzel's supervisor gave him permission to forcibly enter the house. The officers kicked open the front door and found three males inside the residence. The officers noted blood on the back of the front door, blood on the stairwell leading upstairs, and blood on a rag inside the entryway to the residence. Once the residence was secure, the officers took the three males to Duluth police headquarters. The police identified appellant Kyle Dean McClain as one resident, along with roommates G.C. and R.S.

Around midnight, two investigators began interviewing appellant. He was given a Miranda warning and agreed to speak with the police. Appellant said that he had been in his downstairs room all evening watching television. He claimed that he had no visitors that evening but heard a knock at the door. He did not look to see who it was. Appellant admitted that he knew the victim and that they had lived together at 1027 East Third Street only a few months prior to the stabbing. When asked if there were any weapons in the house, appellant said there was a sword in his room that had blood on it because G.C.

3

had accidently cut himself. Appellant stated that there should not be any items in the house with the victim's blood; that he had not seen the victim in months; and that the last time he saw the victim, appellant told him he would "kick his a--" if he came back to the house.

The investigators next spoke with G.C. and R.S. Both men gave substantially similar accounts. They said that they were upstairs that evening and heard someone pounding at the door for about an hour. They heard appellant telling the person pounding on the door to leave, and that once the pounding stopped, appellant went upstairs and told G.C. that he threw the victim out. About thirty minutes later, they once again heard pounding at the door and heard appellant yelling "[g]et the hell out of here." The pounding stopped and they went downstairs to have a couple shots of whiskey with appellant. At that time, both witnesses claimed that appellant only told them that he got rid of the victim but did not mention a fight or physical altercation.

At the same time that Officer Neitzel and others were investigating the victim's known residences or affiliations, the victim was transported from the detoxification center to St. Luke's Hospital for treatment. The hospital staff stabilized the victim's condition and officers began to question him. The victim eventually stated that an individual named Kyle had stabbed him, but he did not know Kyle's last name. The victim said that Kyle lived at 1023 East Third Street. The officers informed Officer Neitzel about the address. Officer Neitzel replied that they found a trail of blood leading to 1027 East Third Street. The officers then asked the victim if he meant 1027 East Third

4

Street, and the victim confirmed that he was stabbed there. The victim then said that Kyle had stabbed him with a machete that was approximately two feet long and explained that he lived at 1027 East Third Street up until two months ago. The victim said he got into a "minor altercation" with Kyle leading up to the stabbing.

After the officers interviewed the victim and the three men from 1027 East Third Street, they applied for a warrant to search 1027 East Third Street. The warrant was based on the belief that blood and objects that can cause sharp force trauma were located inside. The supporting affidavit included fourteen paragraphs. Paragraphs one through six contained facts that the police had obtained by interviewing the victim and locating blood outside of 1027 East Third Street, including the victim's accusation that a man named Kyle stabbed him at that address. Paragraphs seven through fourteen contained information that the officers obtained after forcibly entering 1027 East Third Street, including information gleaned from the interviews with the three males at that residence. After the district court signed the search warrant, the police executed it around 2:30 a.m. on February 19, 2013. The police found a black and silver sword that appeared to have blood and tissue on the blade.

The state charged appellant with first- and second-degree assault. Appellant made a motion to suppress the following: (1) evidence discovered during the initial warrantless search of 1027 East Third Street; (2) evidence discovered during the execution of the search warrant; (3) the collection of appellant's DNA; and (4) the statements made by appellant, G.C., and R.S. before the execution of the search warrant.

5

The district court had two omnibus hearings, the first one dealing with the warrantless entry, and the second regarding the warrant application and the issue of probable cause. At the first omnibus hearing, the district court suppressed the evidence resulting from the warrantless search: blood, a bloody rag, and the statements made by appellant and the two other residents. After a second omnibus hearing, the district court found that there were sufficient factual representations to establish probable cause for the issuance of the warrant, specifically pointing to paragraphs one through six of the affidavit, while holding that the information provided in paragraphs seven through fourteen was suppressed.

At trial, the testimony of all three residents was inconsistent with their first statements to the police. G.C. and R.S. repeated their testimony regarding two instances of prolonged banging on the door on February 18, 2013. They stated that they heard appellant telling someone to leave on both occasions, but they did not hear anything that sounded like a physical altercation. After the person outside left the second time, they went downstairs. G.C. and R.S. now testified that appellant told them that he stuck or stabbed the victim. Appellant further stated that he stabbed the victim because he was banging on the door and "raising hell." R.S. thought appellant was joking until appellant showed them the bloody sword. R.S. testified that appellant did not complain of being attacked by the victim.

Appellant also testified at trial. Appellant stated that he met the victim in 2012 and lived with him at 1027 East Third Street for about a month. Appellant said that he

6

was sleeping when the banging on the door initially woke him. He went to the door and found the victim. Appellant testified that the victim was visibly drunk and staggering. After appellant told him that he could not enter the house, the two argued for a while, and eventually the victim left. The victim returned and resumed pounding on the door. Appellant again went to the door, but this time with a sword, because he wanted to intimidate the victim. Appellant testified that as he was telling the victim to leave, the victim "lunged forward and [appellant] stepped back and brought the sword up." Appellant testified that he believed the sword just "bumped [the victim's] jacket." Appellant said that the victim kind of froze for a second after and then left.

The state questioned appellant about the prior inconsistent statement he gave to the police the night of the crime. The court held that appellant's prior inconsistent statement was admissible for purposes of impeachment. In addition, the district court reversed its pre-trial ruling and held that appellant's prior inconsistent statement was admissible as substantive evidence because the statement would have been inevitably discovered.

After questioning appellant on cross-examination about the prior inconsistent statements, the state sought to use an investigator as a rebuttal witness. Before the investigator testified, the court told the jury that "evidence of any statement [appellant] may have made may be considered by you for all purposes." The district court also permitted the state to play the entire recording of appellant's prior inconsistent statement. Appellant objected to the recorded statement and suggested limiting the rebuttal to the

investigator's testimony. The district court admitted the recorded statement, the jury convicted appellant, and this appeal followed.

## ISSUES

I.     Did the district court commit prejudicial error by admitting appellant's prior inconsistent statement as substantive evidence?

II.     Did the district court properly admit evidence found inside appellant's residence based on a sanitized search warrant?

## ANALYSIS

### I.

The district court initially suppressed appellant's first statement to the police, but later admitted it not only for purposes of impeachment, but as substantive evidence, based on the inevitable-discovery exception to the exclusionary rule. Appellant argues the district court erred because a statement to the police, unlike physical evidence, is not subject to the inevitable-discovery exception. The state argues that the statement should not have been suppressed in the first place because the warrantless entry was justified by the emergency-aid exception. Alternatively, the state argues that the district court properly applied the inevitable-discovery exception.

When the facts are not in dispute and the district court's decision is a question of law, we "independently review the facts and determine, as a matter of law, whether the evidence need be suppressed." *In re Welfare of B.R.K.*, 658 N.W.2d 565, 571 (Minn. 2003) (quotation omitted); *see also State v. Askerooth*, 681 N.W.2d 353, 359 (Minn.

2004) ("When reviewing a pretrial order on a motion to suppress evidence, we may independently review the facts and determine whether, as a matter of law, the district court erred in suppressing or not suppressing the evidence.").

The Fourth Amendment of the U.S. Constitution and article I, section 10 of the Minnesota Constitution protect individuals from unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. The warrantless search of a person's home is presumptively unreasonable. *State v. Othoudt*, 482 N.W.2d 218, 222 (Minn. 1992). Evidence obtained from an illegal search is also inadmissible as "fruit of the poisonous tree." *See State v. Munson*, 594 N.W.2d 128, 135 (Minn. 1999). In addition to physical evidence, "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest . . . is no less the fruit of official illegality than the more common tangible fruits of the unwarranted intrusion." *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963). The warrant requirement is subject to several exceptions. *State v. Licari*, 659 N.W.2d 243, 250 (Minn. 2003). Two exceptions are relevant here: the emergency-aid exception and the inevitable-discovery exception.

We consider three arguments to determine whether appellant's prior inconsistent statement was admissible as substantive evidence. First, we address whether the warrantless entry was justified under the emergency-aid exception. Then, we determine whether the district court properly applied the inevitable-discovery exception. Finally, even if the statement was inadmissible as substantive evidence, we consider whether its admission amounted to prejudicial error.

9

## A.

At the first omnibus hearing, the district court rejected the state's reliance on the emergency-aid exception to justify a warrantless entry. The district court suppressed the statements given by appellant and his two roommates as fruit of the poisonous tree. The state cross-appeals, arguing that the search was justified under the emergency-aid exception.

Under the emergency-aid exception, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect one from imminent injury. *State v. Lemieux*, 726 N.W.2d 783, 787-88 (Minn. 2007). The state has the burden of proof to show that the circumstances meet the emergency-aid exception, and courts apply an objective standard to determine whether the officers reasonably believed that there was an emergency. *Id.* at 788. In determining the reasonableness of entry, we consider whether the officers have reasonable grounds to believe that there is an emergency at hand and an immediate need for police assistance for the protection of life or property. *Id.* We also consider whether there is a reasonable basis, close to probable cause, to associate the emergency with the area or place to be searched. *Id.* Finally, we consider whether the officers' search is primarily motivated by the intent to arrest and seize evidence. *Id.* at 788, 790. In other words, we need to consider whether the officers are motivated to *enter* as criminal investigators or in the

officers' role as community caretakers.[1]  *See Licari*, 659 N.W.2d at 258 (Gilbert, J. dissenting).   However, if there is no objectively reasonable emergency justifying the entry, we need not consider the subjective intent of the officers.  *See Lemieux*, 726 N.W.2d at 790 (stating that an objectively reasonable emergency is necessary to justify the emergency-aid exception for a warrantless search conducted during a criminal investigation).

The officers were not justified in entering 1027 East Third Street based on the emergency-aid exception.  The police were operating under two facts that connected the residence to the stabbing:  (1) the victim was associated with 1027 East Third Street in the past, and (2) Officer Neitzel found blood on the sidewalk leading to 1027 East Third Street while investigating the location.  These two facts suggest that potential criminal acts had occurred, but without evidence of an injured occupant of the residence or an occupant in danger of imminent injury, such facts do not provide a reasonable basis for the police to execute a warrantless entry based on the emergency-aid exception.  At that point, the victim was receiving medical treatment elsewhere and the police were investigating a crime.

Other facts confirm that the police did not have a reasonable basis to believe there was an emergency at hand and execute a warrantless entry.  First, there were no lights on

---

[1] The emergency-aid exception comes from the police's community-caretaker function. As such, it is important to recognize that the exception should not be applied when the officers are pursuing a criminal investigation and use emergency aid as a pretext.  In cases where the police's intent is pursuing a criminal investigation, exigent circumstances and probable cause are the proper tests.  *See B.R.K.*, 658 N.W.2d at 578-79 (describing exigent circumstances test).

at 1027 East Third Street indicating that someone was at home or awake in need of help. Second, there was no evidence in the immediate vicinity of the house indicating that someone needed medical treatment or that someone was in imminent danger. While there was blood on the sidewalk leading up to 1027 East Third Street, pictures show that there was no blood on the steps leading to the house, in the foyer, or on the house itself. Third, Officer Neitzel testified that the blood trail looked like it belonged to one person, which undermines his expressed concern about another possible victim. Fourth, as appellant notes, the police waited for more officers to arrive in order to effectuate the warrantless entry, which is inconsistent with a belief in a true medical emergency.

Finally, in contrast to cases where the police were directed to a house by witnesses or victims, the officers did not have a statement from the victim or a witness at the time of forced entry. *See State v. Anderson*, 388 N.W.2d 784, 787 (Minn. App. 1986) (relying on a call from a witness saying a suspect was throwing people around and the appearance of the front room which was strewn with papers, toys, and clothes); *State v. Halla-Poe*, 468 N.W.2d 570, 573 (Minn. App. 1991) (relying on a statement from a neighbor that the neighbor had helped a person in need of medical assistance into an apartment).

Officer Neitzel had a hunch about the house being the location of an altercation involving the victim, but his suspicion did not give the police an objectively reasonable belief that anyone inside was in immediate need of police assistance for the protection of life. *See Cnty. of Hennepin v. Law Enforcement Labor Servs., Inc., Local No. 19*, 527

12

N.W.2d 821, 826 (Minn. 1995) (stating that facts giving rise to the emergency-aid exception occur in "rare cases").

**B.**

After appellant's testimony at trial, the district court held that appellant's first statement to the police, which derived from the warrantless entry, would have been inevitably discovered. The district court gave three reasons for applying the inevitable-discovery doctrine: the victim identified his attacker as "Kyle," the victim gave an approximate address of the assault, and the victim gave other details of the assault. Appellant argues that the inevitable-discovery doctrine only applies to physical evidence and is inapplicable to statements.

The inevitable-discovery doctrine is an exception to the exclusionary rule. *See Licari*, 659 N.W.2d at 254. "If the state can establish by a preponderance of the evidence that the fruits of a challenged search 'ultimately or inevitably would have been discovered by lawful means,' then the seized evidence is admissible even if the search violated the warrant requirement." *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 2509 (1984)). "This exception has been applied in cases where the police officers possessed lawful means of discovery and were, in fact, pursuing those lawful means prior to their illegal conduct." *State v. Hatton*, 389 N.W.2d 229, 233 (Minn. App. 1986), *review denied* (Minn. Aug. 13, 1986). The doctrine "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5, 104 S. Ct. 2509 n.5.

Minnesota courts have applied the inevitable-discovery doctrine to physical evidence,[2] but have never applied it to statements. The state cites *In re Welfare of J.W.K.*, 583 N.W.2d 752 (Minn. 1998) for the proposition that the inevitable-discovery exception applies to both physical evidence and statements. In *J.W.K.*, a juvenile consented to giving the police a blood sample to clear him from suspicion of vandalism. *J.W.K.*, 583 N.W.2d at 754. The police did not use the blood sample to investigate the vandalism allegation, but instead used it to identify the juvenile with a previous burglary. *Id.* The juvenile did not consent to that use of his blood sample. *Id.* When the police confronted the juvenile with the blood-test results, he confessed. *Id.* The district court suppressed the blood sample and resulting confession as fruit of the poisonous tree because the juvenile's consent did not apply to the burglary. *Id.* The supreme court reversed based on the inevitable-discovery doctrine:

> Because application of the inevitable [] discovery [exception] precludes the suppression of the DNA profile evidence in this case, we do not believe there is any problem with the admissibility of the confession.
>
> . . . .

---

[2] *See Licari*, 659 N.W.2d at 254-55 (remanding to determine if physical evidence would have been inevitably discovered on defendant); *see also State v. Diede*, 795 N.W.2d 836, 849 (Minn. 2011) (considering but rejecting the use of the exception for a cigarette package); *State v. Harris*, 590 N.W.2d 90, 105 (Minn. 1999) (applying the exception to drug found in the defendant's jacket sleeve); *State v. Barajas*, 817 N.W.2d 204, 219 (Minn. App. 2012) (denying use of exception to photographs from a cellular phone), *review denied* (Minn. Oct. 16, 2012); *State v. Lembke*, 509 N.W.2d 182, 184 (Minn. App. 1993) (applying exception to marijuana bag because police would have inevitably discovered it under search incident to arrest); *Geer v. State*, 406 N.W.2d 34, 36 (Minn. App. 1987) (holding that exception applied to sawed-off shotgun that would have been inevitably discovered during inventory search), *review denied* (Minn. July 15, 1987).

14

> Even assuming that the police violated the juvenile's Fourth Amendment rights in using the evidence as they did, suppression of the evidence, including the confession that was obtained, is not required because the record is sufficient to establish that the police inevitably would have obtained a blood sample from the suspect for the use in question.

*Id.* at 757. The supreme court never discussed the statement in terms of the inevitable-discovery doctrine.

To the extent that the state argues that the supreme court implicitly authorized the use of the inevitable-discovery doctrine for statements, such an alleged authorization is not binding law because the supreme court never expressly considered the issue. *See Chapman v. Dorsey*, 230 Minn. 279, 288, 41 N.W.2d 438, 443 (1950) (stating that issues that were never "raised or called to the attention of the court" do not represent binding law); *In re Rollins*, 738 N.W.2d 798, 802 (Minn. App. 2007) ("[A]ssumptions underlying an opinion that are not the subject of a court's analysis are not precedential on the point that is assumed."). And given the importance of the Fourth Amendment rights at issue here, we do not interpret *J.W.K.* to hold that the inevitable-discovery doctrine applies to statements obtained after an unlawful search.

A majority of other courts that have considered the issue have not allowed unlawfully obtained statements into evidence based on the inevitable-discovery doctrine. *See United States v. Vasquez De Reyes*, 149 F.3d 192, 196 (3d Cir. 1998) (declining to use the inevitable-discovery doctrine for a statement but not adopting a general rule); *United States v. Polanco*, 93 F.3d 555, 561 (9th Cir. 1996) (stating that the inevitable-

15

discovery doctrine does not apply to an unconstitutional inculpatory statement); *United States v. White*, 339 F. Supp. 2d 1165, 1176 (D. Kan. 2004) (citing the rule from *Polanco*); *Erickson v. State*, 181 P.3d 1117, 1120 (Alaska Ct. App. 2008) (refusing to apply inevitable-discovery doctrine to statement based on facts); *State v. Lopez*, 896 P.2d 889, 910 (Haw. 1995) (limiting application of inevitable-discovery doctrine to tangible evidence).

The reasoning behind the majority approach is that the content of a statement, by its very nature, is speculative. *Vasquez De Reyes*, 149 F.3d at 196 ("[A] statement not yet made is, by its very nature, evanescent and ephemeral."). In contrast, a tangible object is "hard evidence, and absent its removal will remain where left until discovered." *Id*. Even a slight change in the circumstances under which the statement is made could lead to a different outcome. In other words, while it may be inevitable that the police will question somebody, it is not inevitable that the person will give the same statement under different or even similar circumstances. *See Nix*, 467 U.S. at 444 n.5, 104 S. Ct. at 2509 n.5 (stating that the inevitable-discovery rule involves no speculative elements). Statements are ephemeral in nature; physical evidence quite the opposite.

The facts here present an excellent example of why the inevitable-discovery exception should be inapplicable to statements. The police made an illegal entry into appellant's residence. Appellant was in his room sleeping at the time of the illegal entry. Appellant testified that he took sleep medication and a couple shots of whiskey before going to sleep that night. The police began interviewing appellant shortly after 12:00

a.m., about an hour or two after appellant went to sleep. Although appellant voluntarily agreed to speak with the police, the content of his statement, or his willingness to speak, may well have drastically changed in a short time. For example, the police executed a search warrant the same night as the illegal entry around 2:00 a.m. If appellant had first been interviewed after the execution of this search warrant, the whiskey may have already dissipated from his blood stream, and the sleep medication may have had less of an effect. The extent to which appellant's statement would have changed in a matter of two hours is unknowable.

Another underlying rationale of the inevitable-discovery doctrine is to put the police "in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *See Nix*, 467 U.S. at 443, 104 S. Ct. at 2509. The police will not necessarily be put in a worse position by this holding because there is already a framework that courts can use to determine when illegally obtained confessions are admissible as substantive evidence. In *Weekes*, the Minnesota Supreme Court adopted a test to determine whether a connection between the illegal arrest and confession is tenuous enough to purge the taint of the illegal arrest. *See State v. Weekes*, 268 N.W.2d 705, 708-09 (Minn. 1978) (listing relevant facts). The state can rely on *Weekes* to ensure that police are not put in a worse position by the exclusion of an illegally obtained confession. While the two doctrines will not always overlap, *Weekes* at least provides the state with one avenue to get an unlawfully obtained confession into evidence. There are situations where the police will be put in a worse situation by the suppression of an

illegally obtained statement because the inevitable-discovery doctrine does not apply, but *Nix* commands this result because the doctrine involves no speculative elements. *Nix*, 467 U.S. at 444 n.5, 104 S. Ct. 2509 n.5.

Finally, the inevitable-discovery doctrine is arguably inconsistent with *Weekes*. Instead of showing that the confession was purged of the illegal arrest under *Weekes*, the state could argue that a defendant would have inevitably been interviewed and made the identical confession under similar circumstances. We believe that the required showing from *Weekes* is better suited for addressing confessions or statements that result from an unlawful arrest or interrogation.

The inevitable-discovery doctrine does not apply to statements obtained after an unlawful search.[3] The remaining issue is whether the admission of appellant's statement as substantive evidence was prejudicial.

## C.

In his first statement, when appellant was initially taken into custody by the police, he denied stabbing the victim and stated that he had not seen the victim in months. Appellant later admitted to stabbing the victim in his second statement, but argued at trial that it was an accident. Both parties agree that the first statement was admissible for the purpose of impeachment. The district court initially suppressed the first statement for

---

[3] This opinion, of course, does not change the fact that *evidence derived from* an illegal statement is potentially admissible under the inevitable-discovery doctrine, just not the statement itself. *Nix*, 467 U.S. at 437, 104 S. Ct. at 2506 (admitting physical evidence derived from inadmissible statements).

substantive purposes.  However, after appellant finished testifying, the district court admitted it for purposes of impeachment and as substantive evidence.

Appellant argues that the use of the first statement as substantive evidence was prejudicial because it included several statements by appellant that he would "kick [the victim's] a--" if the victim came back to the house.  Appellant argues that if the jury believed those statements as to the truth of the matter stated—that appellant actually intended to physically assault the victim—then the jury would be less likely to believe that the stabbing was an accident.  The state counters that the prior inconsistent statement had no substantive value at all, but rather was only valuable for purposes of impeachment:  if appellant was seen as lacking credibility, then the jury would have been less likely to believe that the stabbing was an accident.

If appellant establishes a constitutional error by the trial court in admitting a statement, we will still affirm if the erroneous admission of evidence was harmless beyond a reasonable doubt.  *State v. Juarez*, 572 N.W.2d 286, 291-92 (Minn. 1997).  In applying the harmless error test, we "look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict.  If the verdict was surely unattributable to the error, the error is harmless beyond a reasonable doubt." *Townsend v. State*, 646 N.W.2d 218, 223 (Minn. 2002) (citations and quotation omitted).  In determining whether the verdict was surely unattributable to error, we consider the following four factors:  the "manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was

19

effectively countered by the defendant." *State v. Al-Naseer*, 690 N.W.2d 744, 748 (Minn. 2005). Overwhelming evidence of guilt is a very important factor, but we cannot focus on evidence of guilt alone. *Id.*

The four factors from *Al-Naseer* indicate that the erroneous admission of the evidence for substantive purposes was prejudicial. First, the evidence was presented in a prejudicial manner. The state played an audio recording of the entire statement for the jury to hear, in addition to cross-examining appellant. The use of the audio statement was overkill, giving the state the opportunity to reemphasize the earlier courtroom interrogation of appellant. The state also played the nearly 20-minute tape at the end of trial, meaning there was no chance that it "was lost among a plethora of other evidence." *State v. Caulfield*, 722 N.W.2d 304, 314 (Minn. 2006).

Second, the first statement was highly persuasive as substantive evidence. The issue at trial was intent. In the statement, appellant admitted to threatening the victim months before the attack, stating that he would "kick the victim's a--" if he came back. If the jury believed that appellant intended to assault the victim if he returned, then the jury would be less likely to believe appellant's defense that the stabbing was an accident. Moreover, the state relied wholly on circumstantial evidence to establish intent, mainly arguing that the stabbing could not have been an accident given the depth of the wound. The absence of direct evidence regarding intent makes the substantive value of the threats highly persuasive.

Third, the state relied on the statement in its closing arguments. The state argued that "[appellant] made good on his promise to [the victim]" to injure him, and that "[i]t's too bad [the victim] did not take that threat seriously." The state did not mention any other evidence regarding intent in its closing arguments, which further highlights the critical importance of the statement to the state in countering appellant's argument that the stabbing was an accident.

Finally, the statement was admitted as substantive evidence only after appellant's testimony. The admission came as a reversal of the district court's own pre-trial ruling that the statement was inadmissible for substantive purposes. Although appellant did address the statement by claiming the stabbing was an accident, the late admission of the statement as substantive evidence limited appellant's ability to effectively counter it. Additionally, given the dramatic and prejudicial manner in which the statement was presented, appellant's rebuttal was likely not effective. *See State v. Wright*, 726 N.W.2d 464, 478 (Minn. 2007) (stating that cross-examination and closing arguments were insufficient counterweights).

The state argues that the substantive use of the statement was not prejudicial because there was overwhelming evidence that the stabbing was not an accident: appellant's roommates heard him yelling at the victim, appellant told his roommates that he had stuck or stabbed the victim, appellant showed the bloody sword to the roommates, the sword had a wet spot indicating it went in the victim's chest, and appellant never mentioned self-defense or an accident to the roommates. The state

21

contends that based on this evidence, the verdict was surely unattributable to error. But we do not focus on evidence of guilt alone. *Townsend*, 646 N.W.2d at 224; *see also Caulfield*, 722 N.W.2d at 317 (stating that "we have found the error to be harmless only where several factors weigh in that direction" and the harmless error conclusion was reinforced by the strength of the evidence of guilt). Here, other factors indicate that the error was not harmless beyond a reasonable doubt, and the strength of evidence is therefore not controlling.

The erroneous admission of appellant's first statement was not harmless beyond a reasonable doubt. Because appellant's first statement made after the unlawful search was inadmissible as substantive evidence and prejudiced appellant, appellant is entitled to a new trial on remand.

## II.

At the second omnibus hearing, the district court held that the warrant application established probable cause after being sanitized of suppressed evidence. Appellant argues that any evidence obtained through the warrant was inadmissible because the sanitized warrant application did not establish probable cause. Alternatively, appellant argues that the district court never considered whether the police would have requested a warrant without the illegal observations.

While the exclusionary rule generally requires the suppression of evidence acquired as a result of an unlawful search, the "Constitution does not require suppression of evidence that was obtained through an independent source." *State v. Lieberg*, 553

22

N.W.2d 51, 55 (Minn. App. 1996). When a search warrant contains tainted evidence, the district court must conduct a two-step analysis to determine if the independent source doctrine applies. *Id.* The district court must determine if lawfully obtained evidence contained in the warrant application establishes probable cause, and then determine if the police would have applied for the warrant in the absence of the information generated by the illegal search. *Id.*; *see also Murray v. United States*, 487 U.S. 533, 543, 108 S. Ct. 2529, 2536 (1988) (stating that the district court must determine whether the police would have sought a warrant if they had not made an illegal entry). If the district court does not undertake the second step, then a "reviewing court must remand for additional findings." *Lieberg*, 553 N.W.2d at 55.

The first step requires the district court to determine if the sanitized warrant application established probable cause. "An appellate court reviews a district court's decision to issue a warrant only to consider whether the issuing judge had a substantial basis for concluding that probable cause existed." *State v. Rochefort*, 631 N.W.2d 802, 804 (Minn. 2001). Probable cause determinations involve a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983). We consider whether the information presented in the affidavits provided to support probable cause presents "specific facts to establish a direct connection between the alleged criminal activity and the site to be searched." *State v. Souto*, 578 N.W.2d 744, 749 (Minn. 1998).

23

The district court suppressed the information provided in paragraphs seven to fourteen, but concluded that the other information in the warrant application established probable cause. Specifically, the district court found the following information established probable cause to issue a warrant: (1) the police found a trail of blood on the sidewalk leading up to 1027 East Third Street; (2) the victim identified the location of the assault as 1027 East Third Street; (3) the victim alleged that he was stabbed in the chest by Kyle (appellant's first name); and (4) the victim had previously lived at the address and still received mail there. The natural inference of the above facts is that evidence of the crime, including a sword, would be found at the address. *See State v. Brennan*, 674 N.W.2d 200, 204 (Minn. App. 2004) (stating that the "issuing judge is entitled to draw common-sense and reasonable inferences from the facts and circumstances"). The district court therefore had a substantial basis for concluding that probable cause existed. *See State v. Pierce*, 358 N.W.2d 672, 674 (Minn. 1984) (relying on information that the defendant had shot the victim to establish probable cause to search defendant's house).

The second step requires the district court to determine if the "police would have sought a warrant even in the absence of the information generated by the unlawful search." *Lieberg*, 553 N.W.2d at 58. The district court never made a finding on the second step, and, without a finding, appellant argues that remand is required. The state counters that the district court made a ruling on the purpose of the officers' entry during the first omnibus hearing. At the first hearing, the district court held that "despite the officers' good intentions, there was not enough information to justify a warrantless entry"

under the emergency-aid exception. In discussing the officers' intentions for entering the house, the district court was not addressing whether "the [police] would have sought a warrant if they had not earlier entered." *Murray*, 487 U.S. at 543, 108 S. Ct. at 2536. The state's argument that the district court made a finding on the second step is unpersuasive.

The state next argues that appellant was not prejudiced by the evidence seized during the execution of the search warrant and remand is unnecessary. *See Juarez*, 572 N.W.2d at 291-92 (stating that even if an appellant demonstrates error by the district court, a conviction will stand as long as the error was harmless beyond a reasonable doubt). However, the sword was discovered during the execution of the search warrant and it prejudiced appellant. Appellant's defense was that he accidently stabbed the victim when the victim lunged at him. To undermine the accident defense, the state pointed to the depth of the wound. A crime scene investigator measured a "wet spot" approximately five and a half inches long on the tip of the sword. The jury could have relied on the testimony of the investigator and pictures of the sword to determine the depth of the wound. Based on the depth of the wound, the jury could have concluded that the stabbing was not an accident. In fact, the state made this argument during closing remarks. Because the state relied on the sword to establish the depth of the wound and challenge appellant's defense, appellant was prejudiced.

At the new trial, the district court must determine whether the police would have sought a warrant if they had not made the illegal observations. *See Lieberg*, 553 N.W.2d

at 58 ("If the trial court determines the police would have sought a warrant even in the absence of the information generated by the unlawful search, [appellant's] conviction will stand."). If the district court finds that the police would not have sought the warrant without the illegal observations, then the evidence seized during the execution of the search warrant should be suppressed in a new trial.

## D E C I S I O N

Because the inevitable-discovery doctrine does not apply to statements, and appellant was prejudiced by the admission of the statement as substantive evidence, we reverse and remand for a new trial. The district court will also need to determine whether the police would have sought a warrant even in the absence of the information acquired in the earlier unlawful search.

**Reversed and remanded.**

**ROSS**, Judge (concurring specially)

The people of Minnesota have entrusted us with the humbling authority necessary to resolve their pressing conflicts. But their constitution gives us no more authority than that. We must therefore do our duty, when exercising that authority, to overcome the temptation to reach beyond the extant conflict just to pronounce some new rule of law. I write separately because the majority too broadly decides this case, pronouncing a new constitutional rule of law when clearly none is required. The majority broadly holds that "[t]he inevitable-discovery exception to the exclusionary rule is limited to physical evidence" and "does not apply to statements." But neither our federal nor our state supreme court has established this categorical rule, and the circumstances here do not compel us to do so either. We should therefore judge only the conflict before us and leave the constitutional rule-making for a future case that truly requires it.

Superior courts have wisely and routinely emphasized the principle that I think is overlooked today. Our state supreme court declares it repeatedly: "Our general practice is to avoid a constitutional ruling if there is another basis on which a case can be decided." *Erlandson v. Kiffmeyer*, 659 N.W.2d 724, 732 n.7 (Minn. 2003). "It is well-settled law that courts should not reach constitutional issues if matters can be resolved otherwise." *In re Senty-Haugen*, 583 N.W.2d 266, 270 n.3 (Minn. 1998). "This court does not decide important constitutional questions unless it is necessary to do so in order to dispose of the case." *State v. North Star Research & Dev. Inst.*, 294 Minn. 56, 81, 200 N.W.2d 410, 425 (1972). The point cannot be overstated; those declarations of judicial restraint, according

to the United States Supreme Court, should guide our approach to every question that baits us to declare or modify a constitutional rule:

> If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality unless such adjudication is unavoidable. It has long been the Court's considered practice not to decide abstract, hypothetical or contingent questions or to decide any constitutional question in advance of the necessity for its decision or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied or to decide any constitutional question except with reference to the particular facts to which it is to be applied.

*Rescue Army v. Mun. Ct. of Los Angeles*, 331 U.S. 549, 570 n.34, 67 S. Ct. 1409, 1420 (1947) (quotations and citation omitted).

I will not challenge substantively the majority's new rule that the inevitable-discovery doctrine never applies to any statement at any time under any circumstance. I observe in passing, however, that the rule is not uniformly accepted in the federal courts. *See, e.g.*, *United States v. Mohammed*, 512 F. App'x 583, 589–90 (6th Cir. 2013) (holding that the inevitable-discovery doctrine renders the defendant's statements admissible because he "would have been asked the same questions under substantially similar circumstances" and would have made "materially similar" statements under either the hypothetical lawful or actual unlawful police course). I instead write separately to clarify that I disagree with the majority's decision to declare a new constitutional rule where we can, and therefore should, easily resolve the appeal on much narrower ground.

Appellant Kyle McClain gives us that narrow ground. He argues that "the trial court's decision to admit [his] . . . statement was speculative, and application of the

inevitable discovery doctrine was therefore improper." This simple argument persuades me, and, according to the majority's analysis, the argument also persuades the majority. Because the actual circumstances of the unlawful police contact that led to the challenged statement differ so substantially from the timing and circumstances of the hypothetical, inevitable lawful police contact that would have occurred, one must indeed engage in speculation to conclude that McClain would have said substantially the same thing had police followed the lawful course.

The majority rightly identifies the circumstances making this so, and it correctly determines, "The extent to which [McClain's] statement would have changed . . . is unknowable." And that should be the end of it. Put plainly, we should reverse simply because the inevitable-discovery doctrine does not apply to speculative circumstances, *Nix v. Williams*, 467 U.S. 431, 444 n.5, 104 S. Ct. 2501, 2509 (1984), and in this case one would have to speculate to conclude that the circumstances of both the actual and the hypothetical police contact with McClain would have yielded substantially the same statement. Because caselaw informs us that the inevitable-discovery doctrine cannot apply to the challenged statement in *this* case under *these* circumstances, we have no occasion to pronounce a new, categorical constitutional rule that it can never apply to any statement under any circumstances.

We clearly do not need to decide the constitutional question to dispose of this case. If we are going to step out ahead of the Supreme Court of the United States to declare new constitutional law, we should wait until it is necessary to do so. The majority decides much more than is necessary. I therefore concur only in the result.