STATE OF MINNESOTA

IN SUPREME COURT

A23-0875

Court of Appeals                                                    Gaïtas, J.
                                            Concurring in part, dissenting in part,
                                                        McKeig, Moore, III, JJ.

State of Minnesota,

   Appellant/Cross-Respondent,

vs.                                                        Filed: December 3, 2025
                                                    Office of Appellate Courts

Seneca Warrior Steeprock,

   Respondent/Cross-Appellant.

_____

Keith Ellison, Attorney General, Thomas R. Ragatz, Keaon Dousti, Assistant Attorneys General, Saint Paul, Minnesota; and

Kimberly J. Maki, Saint Louis County Attorney, Duluth, Minnesota, for appellant/cross-respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant State Public Defender, Saint Paul, Minnesota, for respondent/cross-appellant.

_____

S Y L L A B U S

1.  The warrantless collection of a buccal swab from a defendant pursuant to Rule 9.02, subdivision 2(1)(f), of the Minnesota Rules of Criminal Procedure is an unreasonable search that violates the United States and Minnesota Constitutions.

1

2.     The warrantless collection of a buccal swab from the defendant requires a new trial because no exception to the exclusionary rule applies and the error was not harmless beyond a reasonable doubt.  We overrule *In re Welfare of J.W.K.*, 583 N.W.2d 752 (Minn. 1998), as clearly in conflict with the inevitable discovery rule articulated in *Nix v. Williams*, 467 U.S. 431 (1984), and reiterated in *State v. Diede*, 795 N.W.2d 836, 849 (Minn. 2011).

3.     The word "testimony" in Minnesota Statutes section 634.04, which requires corroboration of accomplice testimony, means statements made under oath.

Affirmed.

#### O P I N I O N

GAÏTAS, Justice.

Respondent/cross-appellant Seneca Warrior Steeprock was charged with attempted first-degree premeditated murder and unlawful possession of a firearm following a shooting in Duluth.  Before trial, the district court ordered Steeprock to submit to a buccal swab—a swabbing of the inside of the cheek—for DNA testing pursuant to Minnesota Rule of Criminal Procedure 9.02, subdivision 2(1)(f).  Relying solely on the district court's order, investigators collected a buccal swab from Steeprock, who was in jail.  At trial, appellant/cross-respondent State of Minnesota presented DNA evidence from the buccal swab that connected Steeprock to the shooting, as well as recorded phone calls and texts of Steeprock's alleged accomplice that implicated Steeprock in the crime.  Steeprock was convicted and sentenced to prison.  The court of appeals reversed, determining that the warrantless buccal swab violated Steeprock's constitutional rights and required a new trial,

2

but that Steeprock was not entitled to an accomplice-corroboration jury instruction. The State petitioned for review, arguing that the warrantless buccal swab was lawful because it was taken pursuant to a court order. Steeprock conditionally cross-petitioned for review, contending, in part, that the district court erroneously denied his request for an accomplice-corroboration jury instruction. We granted both petitions.

We conclude that the warrantless buccal swab was an unconstitutional search, that no exception to the exclusionary rule applies, and that the erroneous admission of the DNA evidence obtained from the buccal swab at Steeprock's trial was not harmless beyond a reasonable doubt. In addition, we conclude that Steeprock was not entitled to an accomplice-corroboration jury instruction because the statements of his alleged accomplice were not made under oath. We therefore affirm the decision of the court of appeals.

**FACTS**

On a December afternoon in 2020, C.J. was shot multiple times in a Duluth apartment. Although C.J. survived, he sustained significant injuries and lost nearly half of his blood. C.J. told investigators that he did not remember who shot him. The apartment resident did not see who shot C.J., but she told investigators that two or three people had entered her apartment before the shooting, that one person sounded like a male and another sounded like a female, and that there were two different guns.

Investigators learned that C.J. had been in Duluth visiting his cousin T.J. On the day before the shooting, C.J. spent time with T.J.'s friend, A.C. Investigators discovered that C.J. had a pre-existing conflict with A.C.'s brother, M.C.

3

Following the shooting, investigators located C.J.'s car parked outside the Gateway Towers apartment building. Steeprock and A.C., who were suspects in the shooting, exited the apartment building and approached the car. When Steeprock saw the investigators, he ran. A police sergeant chased Steeprock until Steeprock stopped at the bottom of a snowy hill, lay down on the ground, and spread his arms out to his sides. Investigators arrested Steeprock. When he was arrested, Steeprock did not possess a gun. Investigators searched the area but did not find a gun.

Another investigator arrested A.C. in the Gateway Towers parking lot. Officers searched her purse and discovered a handgun inside.

Investigators collected DNA from the gun inside A.C.'s purse. Subsequent analysis revealed that the gun contained a mixture of DNA that was consistent with the DNA of at least three individuals, including A.C. Forensic testing showed that the gun in A.C.'s purse fired seven of fifteen cartridge casings collected from the Duluth apartment after the shooting.

Investigators again searched the location where Steeprock had been apprehended. This time, with the assistance of a dog, investigators found a handgun buried in a snowbank. They later determined that this second gun fired eight of the fifteen cartridge casings found at the shooting scene. Investigators also swabbed the gun, and a later analysis of the sample revealed the presence of DNA evidence.

As part of the investigation, investigators applied for a search warrant to obtain, among other things, buccal swabs[1] from Steeprock and A.C. for DNA testing. A district court judge signed the search warrant.

Based on the investigation, the State charged Steeprock with attempted first-degree premeditated murder under an aiding and abetting theory of liability. Minn. Stat. § 609.17, subd. 1; Minn. Stat. § 609.185(a)(1); Minn. Stat. § 609.05, subd. 1.[2] Additionally, the State charged him with unlawful possession of a firearm. Minn. Stat. § 624.713, subd. 1(2). Steeprock pleaded not guilty to the charges and requested a jury trial.

The State also charged A.C. with shooting C.J. A.C. then challenged the validity of the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978) (establishing a test through which a defendant may seek to invalidate a warrant by challenging the truthfulness of factual statements in the warrant application). After A.C.'s challenge, the State, in Steeprock's case, stipulated that it would not use any evidence obtained pursuant to the challenged search warrant—including Steeprock's buccal sample.

The State did not seek a new search warrant to obtain Steeprock's DNA for comparison with DNA found on the handgun from the snowbank. Instead, relying on Minnesota Rule of Criminal Procedure 9.02, subdivision 2(1)(f), the State moved the

---

[1]     A buccal swab is a method of DNA collection that "involves gently swab[bing] the inside of the cheek [with a sterile cotton swab]." *State v. Johnson*, 813 N.W.2d 1, 5 (Minn. 2012) (alteration in original) (citation omitted) (internal quotation marks omitted).

[2]     The State later abandoned the aiding and abetting theory and prosecuted Steeprock as a principal offender.

district court to order Steeprock to produce a "saliva sample."[3]  That rule allows a district court to order, "subject to constitutional limitations," enumerated pretrial "discovery procedures" when the prosecution shows that the procedures "will materially aid in determining whether the defendant committed the offense charged."  Minn. R. Crim. P. 9.02, subd. 2(1)(f).  Over Steeprock's constitutional objection, the district court granted the State's motion and ordered Steeprock to provide a DNA sample.  Investigators took a sample of Steeprock's DNA via buccal swab while he was in custody in Douglas County.

Using the buccal swab collected pursuant to the district court's order, investigators compared Steeprock's DNA to the DNA found on the gun retrieved from the snowbank.  Investigators determined that the gun contained a mixture of DNA from at least four individuals.  One of the DNA profiles in the mixture was consistent with Steeprock's DNA.

---

[3]      Minnesota Rule of Criminal Procedure 9.02, subdivision 2(1)(f), expressly authorizes the ordering of *saliva samples*, but does not expressly reference buccal swabs—though the rule's language indicates that the list of bodily materials that the court may order a defendant to provide is non-exhaustive.  Minn. R. Crim. P. 9.02, subd. 2(1)(f) ("[T]he court before trial may, subject to constitutional limitations, order a defendant to: . . . (f) Permit the taking of blood, hair, saliva, urine, *or samples of other bodily materials* that do not involve unreasonable intrusion . . . ." (emphasis added)).

Here, the State moved the district court to order Steeprock to submit a *saliva sample* for comparative DNA analysis under Rule 9.02, subdivision 2(1)(f).  The district court ordered Steeprock to "provide a DNA sample" to the State, not specifying whether he was required do so via buccal swab or saliva sample.  Instead of taking a saliva sample, as is explicitly authorized in Rule 9.02, law enforcement obtained Steeprock's DNA by taking a buccal swab.

The court of appeals decision refers to Steeprock's DNA sample as having been collected by a "saliva sample."  *State v. Steeprock*, 10 N.W.3d 683, 688 (Minn. App. 2024).  Because the record shows that his DNA was collected via a buccal swab, we use the term "buccal swab" throughout this opinion to refer to the DNA collection process.

6

At Steeprock's jury trial, the State argued to the jury that Steeprock was one of two assailants who shot C.J. The State relied, in part, on DNA evidence. A forensic scientist testified that DNA found on the gun from the snowbank matched a "known DNA or reference sample[]" from Steeprock.

The State also relied on A.C.'s phone calls and text messages from jail. Over Steeprock's objection, the district court allowed the State to admit into evidence four recordings of jail phone calls between A.C. and her brother, M.C. It also permitted the State to introduce six text messages that A.C. sent and received while in jail. In these phone calls and messages, A.C. discussed her plan to shoot someone and the shooting itself, and she referenced Steeprock. The district court determined that these communications were admissible under the statement-against-interest exception to the hearsay rule. *See* Minn. R. Evid. 804(b)(3) (providing that a hearsay statement is admissible if, at the time it was made, the statement was "so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true").

Steeprock asked the district court to instruct the jury on the statutory requirement for corroboration of accomplice testimony, arguing that A.C.'s phone calls and texts were

the equivalent of accomplice testimony.[4]  The district court denied Steeprock's motion, determining that A.C.'s out-of-court statements did not constitute "testimony."

The jury found Steeprock guilty of both attempted first-degree premeditated murder and unlawful possession of a firearm.  After entering convictions for both offenses, the district court sentenced Steeprock to concurrent prison terms of 240 months for attempted first-degree murder and 60 months for unlawful possession of a firearm.

Steeprock appealed to the court of appeals.  Before the court of appeals, he challenged the constitutionality of the warrantless DNA sample taken pursuant to the district court's order, the district court's denial of his request for an accomplice-corroboration jury instruction, and the district court's admission of A.C.'s out-of-court statements under the statement-against-interest exception to the hearsay rule.[5]  *State v. Steeprock*, 10 N.W.3d 683, 691 (Minn. App. 2024).

In a unanimous decision, the court of appeals reversed Steeprock's convictions and remanded for a new trial.  It concluded that the State obtained Steeprock's DNA during an unconstitutional warrantless search, that no exception to the exclusionary rule applied, and that the DNA evidence erroneously admitted at trial was not harmless beyond a reasonable doubt.  *Id.* at 706.  Although the constitutional violation required a new trial,

---

[4]  *See* Minn. Stat. § 634.04 (providing that "[a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense").

[5]  Steeprock also moved to strike parts of the State's supplemental response brief before the court of appeals, but that is not relevant to this appeal.  *State v. Steeprock*, 10 N.W.3d 683, 705–06 (Minn. App. 2024).

the court of appeals also considered Steeprock's argument regarding the requested accomplice-corroboration jury instruction, noting that the issue was likely to recur during any new trial. *Id.* at 701. The court of appeals determined that the district court did not err in declining to give an accomplice-corroboration jury instruction because A.C.'s phone calls and texts were not "testimony." *Id.* at 704. Finally, the court of appeals declined to address the merits of Steeprock's hearsay argument. *Id.* at 704–05.

The State petitioned for review of the court of appeals' decision regarding the constitutionality of the district court's order for Steeprock's DNA. Steeprock filed a conditional cross-petition, seeking review of the two additional issues raised before the court of appeals. We granted both petitions.

**ANALYSIS**

I.

We first consider whether the district court's discovery order requiring Steeprock to provide a DNA sample resulted in an unconstitutional search that necessitates reversal of Steeprock's convictions and remand for a new trial. The State argues that collecting a buccal swab from Steeprock was a limited intrusion that did not require a search warrant and could be authorized instead by a court order under the Minnesota Rules of Criminal Procedure. Moreover, the State contends, even if the buccal swab was an unconstitutional search, the suppression of the resulting DNA evidence is unnecessary because exceptions to the exclusionary rule apply. Finally, the State maintains that even if the district court erroneously admitted the DNA evidence at Steeprock's trial, the error was harmless beyond a reasonable doubt. The State urges us to reverse the court of appeals' decision, which

9

concluded that the buccal swab was an unconstitutional search and that the admission of the resulting DNA evidence prejudiced the outcome of Steeprock's trial. We address the constitutionality of the district court's order here in Part I and address the State's arguments that an exception to the exclusionary rule applies and that any error was harmless in Part II.

In considering the court of appeals' decision, several fundamental constitutional principles guide our analysis. Both the Fourth Amendment to the United States Constitution and Article 1, Section 10 of the Minnesota Constitution prohibit "unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. I, § 10. The prevailing purpose of these provisions "is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966).

Constitutional protections extend to intrusions into the body. *Id.* Indeed, "a compelled physical intrusion" into a person's body to collect evidence for a criminal prosecution "implicates an individual's most personal and deep-rooted expectations of privacy." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (citation omitted) (internal quotation marks omitted).

"The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all circumstances of the particular governmental invasion of a citizen's personal security." *State v. Bartylla*, 755 N.W.2d 8, 15 (Minn. 2008) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977)). Generally, "the reasonableness of a search depends on governmental compliance with the Warrant Clause, which requires authorities to demonstrate probable cause to a neutral magistrate and thereby convince [the

10

magistrate] to provide formal authorization to proceed with a search by issuance of a particularized warrant." *Id.* "A search is presumptively unreasonable unless it is conducted under a valid warrant or a specific exception to the warrant requirement applies." *State v. McNeilly*, 6 N.W.3d 161, 175 (Minn. 2024). We review the constitutionality of a search or seizure de novo. *Id.*

With these principles in mind, we turn to the question of whether investigators conducted a warrantless search by collecting a buccal swab from Steeprock.

A.

In considering whether there was an unreasonable search, the threshold question is whether there was a search. "A search occurs when the government intrudes upon a 'reasonable expectation of privacy' to gain information." *State v. Westrom*, 6 N.W.3d 145, 153 (Minn. 2024) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)); *see also State v. Leonard*, 943 N.W.2d 149, 156 (Minn. 2020) (stating that under the Minnesota Constitution, "a search occurs when law enforcement intrudes upon an individual's subjective expectation of privacy that society is prepared to recognize as reasonable").

The State conceded in its briefing and during oral argument that investigators conducted a search when they performed a buccal swab to collect Steeprock's DNA. Indeed, whether a buccal swab for DNA analysis constitutes a search is a settled question. In *Maryland v. King*, the United States Supreme Court held that "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search." 569 U.S.

11

435, 446 (2013). We therefore agree with the parties that investigators conducted a search when they took a buccal swab from Steeprock to collect his DNA.

B.

Because we have concluded that the collection of Steeprock's DNA was a search, we next consider whether the search was reasonable under the United States and Minnesota Constitutions. "Generally, a search conducted without a warrant is per se unreasonable." *State v. Rohde*, 852 N.W.2d 260, 263 (Minn. 2014) (citation omitted) (internal quotation marks omitted). However, a warrantless search may be reasonable, and thus constitutional, if it falls within an exception to the warrant requirement. *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971). The State bears the burden of establishing that an exception to the search warrant requirement applies. *State v. Licari*, 659 N.W.2d 243, 250 (Minn. 2003).

Here, it is undisputed that the State did not obtain a search warrant before collecting Steeprock's DNA; the district court's discovery order, which authorized the buccal swab, was not a search warrant. Thus, as a general matter, the buccal swab was an unconstitutional search unless a specific exception to the warrant requirement applies. *See McNeilly*, 6 N.W.3d at 175.

The State seemingly asks us to recognize an exception to the search warrant requirement for "limited" investigatory searches or seizures that occur after a person is

charged with a crime.[6]  As support for this proposition, the State cites to other jurisdictions

that allow for the collection of some types of identification evidence pursuant to court-

issued discovery orders.[7]  *See, e.g.*, *People v. Madson*, 638 P.2d 18, 31–33 (Colo. 1981)

(handwriting exemplar); *Bousman v. Iowa Dist. Ct.*, 630 N.W.2d 789, 798 (Iowa 2001)

(saliva sample); *In re Nontestimonial Identification Ord. Directed to R.H.*, 762 A.2d 1239,

1246 (Vt. 2000) (saliva sample); *State v. Rodriguez*, 921 P.2d 643, 650–51 (Ariz. 1996)

(palm print); *State v. Hall*, 461 A.2d 1155, 1161 (N.J. 1983) (appearance in a lineup).  And

the State points out that Rule 9.02, subdivision 2(1)(f), of the Minnesota Rules of Criminal

Procedure—the rule that the district court relied on to order the buccal swab at issue here—

already authorizes a warrantless search for DNA evidence when a defendant has been

charged with a crime and the district court determines that the evidence would "materially

aid in determining whether the defendant committed the offense charged."  Minn. R. Crim.

P. 9.02, subd. 2(1)(f).  That rule provides, in relevant part,

> [o]n the prosecutor's motion, with notice to the defense and a showing that
> one or more of the discovery procedures below will materially aid in
> determining whether the defendant committed the offense charged, the court
> before trial may, subject to constitutional limitations, order a defendant to:
>   . . . .
>     (f) Permit the taking of blood, hair, saliva, urine, or samples of other
> bodily materials that do not involve unreasonable intrusion, but the court

---

[6]     When asked to clarify at oral argument, the State explained that it is seeking an exception to the warrant requirement.  But the State's brief did not explicitly ask us to adopt a new exception.

[7]     The State cites two federal cases for the proposition that the Fourth Amendment allows certain "limited" searches based on less than probable cause.  *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881–84 (1975); *Davis v. Mississippi*, 394 U.S. 721, 724–27 (1969).  Neither of these cases adopted a "limited search" exception to the warrant requirement, however.

must not permit a blood sample to be taken except on a showing of probable cause to believe that the test will aid in establishing the defendant's guilt . . . .

*Id.*

Steeprock disagrees that the cases from other jurisdictions or Rule 9.02, subdivision 2(1)(f), support an exception to the warrant requirement. He emphasizes that the challenged conduct—collecting a buccal swab from him for DNA testing—was more intrusive than the activity addressed by some of the State's cited case law. Steeprock also notes that the few decisions from other jurisdictions that have allowed warrantless searches of a person's mouth are inconsistent with established Minnesota law. *See Ord. Directed to R.H.*, 762 A.2d at 1244–7 (upholding a warrantless, court-ordered saliva collection, in part, because of the court's view of its level of intrusiveness and stating that "by talking and yawning, we frequently expose the interior of our mouth to public view."); *Bousman*, 630 N.W.2d at 798 (upholding a statute authorizing court-ordered "investigatory detentions to obtain identifying information from a suspect based on less than probable cause," in part, because saliva sampling does not "involve[] a significant intrusion into a person's bodily security"). He points out that we held in *State v. Hardy* that a police officer's request for a suspect to open his mouth so that the officer could check for drugs was sufficiently intrusive that it constituted an unreasonable search for which probable cause was required. 577 N.W.2d 212, 216 (Minn. 1998).

Steeprock also observes that Rule 9.02, subdivision 2(1)(f), requires a district court to defer to constitutional requirements. The rule states that any court order for

14

identification evidence is "subject to constitutional limitations." Minn. R. Crim. P. 9.02, subd. 2(1)(f).

We reject the State's apparent invitation to recognize an exception to the warrant requirement for investigatory buccal swabs once an individual has been charged with a criminal offense. In so doing, we accept that a buccal swab is a relatively unintrusive method of collecting evidence from a person's body. *See King*, 569 U.S. at 446 (characterizing a buccal swab as a "negligible" physical intrusion that is "far more gentle" than a blood draw). We also note that in *King*, the United States Supreme Court upheld the constitutionality of a warrantless buccal swab performed as a routine booking procedure to identify arrestees in jail pursuant to a Maryland statute, comparing an individual's DNA profile to a fingerprint and observing that DNA is "another metric of identification used to connect the arrestee with his or her public persona." 569 U.S. at 451. And we acknowledge that Rule 9.02, subdivision 2(1)(f), of our criminal procedure rules authorizes a district court to order a charged defendant to provide "saliva" if it "will materially aid in determining whether the defendant committed the offense charged," so long as the order is "subject to constitutional limitations." For four reasons, however, we disagree with the State that there is—or should be—an exception to the constitutional warrant requirement for investigatory buccal swabs of charged defendants.

First, the law recognizes a distinction between a routine booking procedure, such as the one upheld in *King*, and a search to discover evidence of wrongdoing, such as the one at issue here. "When law enforcement seeks to conduct a search *to uncover evidence of criminal wrongdoing*, reasonableness typically requires law enforcement to obtain a

15

judicial warrant . . . ." *State v. Thompson*, 886 N.W.2d 224, 228 (Minn. 2016) (emphasis added); *see also Riley v. California*, 573 U.S. 373, 382 (2014) ("[W]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." (citation omitted) (internal quotation marks omitted)); *McNeely*, 569 U.S. at 148 (considering the government's purpose "*for use as evidence in a criminal investigation*" in determining the reasonableness of taking a warrantless blood sample from a suspected drunk driver (emphasis added)); *King*, 569 U.S. at 469 (Scalia, J., dissenting) (stating that whether a search's "principal end is ordinary crime-solving" is central to determining its constitutionality); *cf. King*, 569 U.S. at 449–56, 65 (observing that, under the authorizing statute, "[n]o purpose other than identification is permissible").

Second, although the immediate physical intrusion of a buccal swab may be minimal, "[f]orensic DNA technology has come a long way since *King*." *State v. Carbo*, 6 N.W.3d 114, 128 (Minn. 2024) (Procaccini, J., concurring). Law enforcement can retain DNA evidence, which can provide highly sensitive genetic information, including ancestry, disease carrier status, and physical traits. *Birchfield v. North Dakota*, 579 U.S. 438, 462–63 (2016) (stating that buccal swab DNA samples "put into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained"); *Carbo*, 6 N.W.3d 114, 128–29 (Procaccini, J., concurring). Accordingly, a buccal swab obtained for DNA testing may result in a greater intrusion than the physical collection procedure itself.

Third, we are not persuaded by the case law that the State offers in support of its proposed exception. The State offers no federal precedent to support its argument. And the case law from other states is unavailing for the reasons Steeprock sets forth.

Finally, although Rule 9.02, subdivision 2(1)(f), authorizes a district court to order a charged defendant to provide "saliva" if it "will materially aid in determining whether the defendant committed the offense charged," the rule, by its plain terms, is "subject to constitutional limitations." Accordingly, the rule itself does not dispense with constitutional requirements, including the requirement for a search warrant to conduct a search.

When a warrantless search does not fall within an established exception to the constitutional requirement for a search warrant, it is per se unreasonable. *State v. Hummel*, 483 N.W.2d 68, 72 (Minn. 1992). Here, the State fails to meet its burden to show that an established exception to the warrant requirement justified the warrantless buccal swab. Thus, we conclude that it was an unreasonable search.

This, however, does not end our analysis because the State, as an alternative argument, suggests that the district court's order authorizing the search under Rule 9.02, subdivision 2(1)(f), was functionally equivalent to a search warrant. We next address that argument.

C.

The State contends that the district court, by authorizing the search under Rule 9.02, subdivision 2(1)(f), "made what was essentially the equivalent of a probable-cause determination." The State notes that there must be probable cause to charge a defendant

with a crime before a district court can order the defendant to produce saliva under Rule 9.02, subdivision 2(1)(f). And it argues that the requirement in the rule that evidence "will materially aid" a prosecution is "as strong" as the constitutional requirement for probable cause.

We also reject this argument. The standard for probable cause to search is distinct from the standard for probable cause to charge. *Compare State v. Lopez*, 778 N.W.2d 700, 703 (Minn. 2010) (stating that probable cause to charge an individual with a crime requires "facts . . . showing a reasonable probability that *the person committed the crime*" (emphasis added)), *with State v. Wiggins*, 4 N.W.3d 138, 145 (Minn. 2024) (stating that probable cause to search "requires a fair probability that *contraband or evidence of a crime will be found in a particular place*" (emphasis added) (citation omitted) (internal quotation marks omitted)). Moreover, the "materially aid" standard is different than the probable-cause-to-search standard. While the probable-cause-to-search standard requires a sufficient showing "*that* contraband or evidence of a crime will be found in a particular place," the "materially aid" standard only requires a sufficient showing that the discovery will aid in determining "*whether* the defendant committed the offense charged." *Compare* Minn. R. Crim. P. 9.02, subd. 2(1) (requiring a determination that the ordered discovery procedure "will materially aid in determining *whether the defendant committed the offense charged*" (emphasis added)), *with Wiggins*, 4 N.W.3d at 145 (stating that probable cause to search "requires a fair probability *that contraband or evidence of a crime will be found in a particular place*" (emphasis added) (citation omitted) (internal quotation marks

18

omitted)).  The State thus fails to offer a convincing argument as to how these standards are equivalent.

Further, under both the United States and Minnesota Constitutions, an affiant seeking a search warrant must provide information establishing probable cause under "[o]ath or affirmation."  U.S. Const., amend. IV; Minn. Const., art. I, § 10.  Here, the request for an order compelling a buccal swab under Rule 9.02, subdivision 2(1)(f), was supported only by the prosecutor's unsworn statements.  Even if we assumed the standards were equivalent, the State failed to comply with a requirement for a search warrant.

At oral argument, the attorney representing the State advised that district courts commonly authorize buccal swabs of charged defendants under Rule 9.02, subdivision 2(1)(f).  We emphasize that discovery orders issued under Rule 9.02, subdivision 2(1)(f), must comply with constitutional requirements and the rule does not provide an exception to the requirement for a warrant.  Because a buccal swab is a search, the government may perform a buccal swab only pursuant to a valid search warrant or a recognized exception to the warrant requirement.

Here, there was no warrant authorizing the buccal swab, and no exception to the warrant requirement applied.  Thus, the buccal swab was an unreasonable search that violated Steeprock's rights under the United States and Minnesota Constitutions.

II.

Because we conclude that the collection of Steeprock's DNA was an unreasonable search, we next consider whether the DNA evidence should have been suppressed under the exclusionary rule.

When the government obtains evidence in violation of the constitutional protection against unreasonable searches and seizures, the exclusionary rule generally prohibits using the evidence in a criminal proceeding against the individual whose rights were violated. *United States v. Calandra*, 414 U.S. 338, 347 (1972); *State v. Horst*, 880 N.W.2d 24, 36 (Minn. 2016). The exclusionary rule is a judicially created remedy that prohibits using "evidence obtained in violation of the Fourth Amendment . . . in a criminal proceeding against the victim of the illegal search and seizure." *Calandra*, 414 U.S. at 347; *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (extending the exclusionary rule to apply to the states). The purpose of the exclusionary rule under the United States Constitution is to deter unlawful police conduct. *Stone v. Powell*, 428 U.S. 465, 486 (1976). We have acknowledged additional purposes for the exclusionary rule under the Minnesota Constitution, including preserving judicial integrity and deterring unlawful government conduct more generally. *State v. Malecha*, 3 N.W.3d 566, 572, 577 n.4, 578 (Minn. 2024).

Suppression of evidence is not required when an exception to the exclusionary rule applies, however. *See State v. Lindquist*, 869 N.W.2d 863, 868–69 (Minn. 2015). Because the exclusionary rule is a remedy and is thus "analytically distinct . . . from whether a constitutional violation occurred," the rule does not "require automatic suppression of evidence obtained by unlawful means." *Lindquist*, 869 N.W.2d at 872 (citation omitted) (internal quotation marks omitted). We have declined to apply the exclusionary rule to address violations of Article 1, Section 10 of the Minnesota Constitution when applying the rule would not serve its underlying remedial objectives. *Id.* at 870–71. Thus, we have recognized several exceptions to the exclusionary rule, including the inevitable discovery

20

exception, *Licari*, 659 N.W.2d at 254; a limited good-faith exception, *Lindquist*, 869 N.W.2d at 876; and the independent source doctrine, *State v. Hodges*, 287 N.W.2d 413, 415–16 (Minn. 1979).

The State argues that two of those exceptions apply here: the inevitable discovery exception and the good-faith exception. We consider each of these exceptions in turn.

A.

The inevitable discovery exception to the exclusionary rule provides that "[i]f the [S]tate can establish by a preponderance of the evidence that the fruits of a challenged search 'ultimately or inevitably would have been discovered by lawful means,' then the seized evidence is admissible even if the search violated the warrant requirement." *Licari*, 659 N.W.2d at 254 (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). Under this exception, the State may not rely on "speculative elements" but instead must "focus[] on demonstrated historical facts capable of ready verification or impeachment." *Id.* (quoting *Nix*, 467 U.S. at 444–45 n.5); *see also Nix*, 467 U.S. at 435–36, 444 (applying the inevitable discovery exception where the historical facts showed that, despite the constitutional violation, law enforcement would have inevitably discovered the evidence). Importantly, "[t]he State may not show inevitable discovery by claiming that if it had not searched illegally, it would have done so legally." *State v. Diede*, 795 N.W.2d 836, 849 (Minn. 2011). The State bears the burden to show inevitable discovery. *See id.* at 850.

The State argues that Steeprock's DNA evidence was properly admitted under the inevitable discovery exception because DNA "is identity evidence that can—and if necessary would—be obtained lawfully with a search warrant instead of a Rule 9.02 order."

21

In other words, the State seems to argue that because DNA evidence never changes, it can always be inevitably discovered by lawful means. For this proposition, the State relies primarily on our decision in *In re Welfare of J.W.K.*, 583 N.W.2d 752 (Minn. 1998).

In *J.W.K.*, we applied the inevitable discovery exception to the exclusionary rule to reverse the suppression of a juvenile's DNA. *Id.* at 757. The juvenile consented to a blood draw for DNA comparison to evidence obtained at the scene of a crime. *Id.* at 753–54. Although the juvenile was ruled out as a suspect, investigators retained the juvenile's blood sample. *Id.* at 754. Later, and without the juvenile's consent, investigators compared DNA obtained from the blood sample to DNA collected from the scene of a separate crime, and they determined that there was a match. *Id.* Based on the confirmatory DNA evidence, the juvenile confessed to the separate crime. *Id.*

The district court determined that investigators did not have consent to retain the juvenile's DNA evidence and suppressed both the DNA evidence and the juvenile's resulting confession. *Id.* at 754. The court of appeals affirmed. *Id.* at 753. We reversed, however, reasoning that, if investigators "had not submitted the sample in question for DNA profiling in connection with the other offense, . . . they presumably would have tried to obtain . . . permission" to do so. *Id.* at 757. And, we noted, if investigators had sought and obtained consent, the original blood-sample DNA evidence would have connected the juvenile to the separate crime because "unlike alcohol in the blood, . . . the DNA profile present in one's blood stays the same from day to day." *Id.* Moreover, we reasoned that, if the juvenile had refused to consent to DNA testing, "the police presumably would have sought and obtained a warrant authorizing either the taking of a new sample or the

22

submission of the previously-obtained sample . . . for DNA profiling." *Id.* We observed

that the record contained sufficient facts to establish probable cause to search. *Id.*[8]

A review of our case law reveals that we have moved away from the rationale that

we relied on in *J.W.K.*—if investigators would have conducted a lawful search, they would

have inevitably discovered the evidence unlawfully found during an unconstitutional

search. As noted above, in *State v. Diede*, we explicitly rebuffed that rationale.

795 N.W.2d at 849. There, investigators conducted an unlawful search of the defendant's

cigarette package and found methamphetamine. *Id.* at 846. Before this court, the State

argued that "if the police had not illegally searched [the defendant's] cigarette package,

they *could have* arrested her and found the contents of the package." *Id.* at 849 (emphasis

---

[8]      The State also cites *State v. Eppler*, 362 N.W.2d 315 (Minn. 1985), which we relied on in *J.W.K.* In *Eppler*, the defendant voluntarily reported to the police station, accompanied by her attorney, upon learning that she was a suspect in several thefts. 362 N.W.2d at 316. The defendant allowed a police officer to take her photo for the purpose of eyewitness identification. *Id.* But the defendant's consent was conditioned on her attorney being able to view the photo and being present when it was shown to the eyewitnesses. *Id.* The police officer then showed the eyewitnesses the defendant's photo without the attorney present, and the eyewitnesses identified the defendant as the perpetrator. *Id.*

The defendant moved to suppress the eyewitness identification, arguing that "the officer broke the agreement to let [the] defendant's attorney preview the photographic display and be present when the pictures were shown to the witnesses." *Id.* at 317. The district court denied the motion, and the defendant was ultimately convicted. *Id.* at 316. We affirmed the district court's decision to admit the eyewitness identification into evidence. *Id.* Initially, we observed that the officer did not need the defendant's consent to a photograph because the officer had probable cause to arrest the defendant. *Id.* at 317. Thus, the officer could have arrested the defendant "and taken pictures of her immediately." *Id.* Then, citing *Nix*, we stated that "it appears inevitable that the police would have obtained a picture of [the defendant] through independent means, would have shown that picture to the eyewitnesses, and would have obtained the eyewitness identification evidence." *Id.*

23

added). Rejecting the State's argument, we stated that "[t]he State may not show inevitable discovery by claiming that if it had not searched illegally, it would have done so legally." *Id.* We reasoned that the inevitable discovery exception would swallow Fourth Amendment protections if law enforcement only had to identify a lawful means it could have—but did not—pursue. *Id.*

*Diede* is consistent with United States Supreme Court jurisprudence, including *Nix*—the principal United States Supreme Court decision concerning the inevitable discovery exception. 467 U.S. at 444. Under *Nix*, unlawfully obtained evidence is admissible under the inevitable discovery exception only if the evidence "ultimately or inevitably would have been discovered by lawful means." *Id.* The inquiry of whether evidence would have been inevitably discovered *cannot* "involve[] . . . speculative elements," but instead must only rely "on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444 n.5. The analysis in *Diede* adheres to the rule articulated in *Nix*. *See Diede*, 795 N.W.2d at 849 ("The essence of the State's argument is that if the police had not illegally searched Diede's cigarette package, they could have arrested her and found the contents of the package. . . . The State showed no reason . . . why it would inevitably have discovered the methamphetamine.").

However, the analysis in *J.W.K.* does not adhere to the rule articulated in *Nix*. Speculation was central to this court's reasoning in *J.W.K.*:

> *If* the police in this case had not submitted the sample in question for DNA profiling in connection with the other offense, . . . they *presumably* would have tried to obtain . . . permission . . . . *If* they had obtained his permission, *presumably* they would have sent the previously-obtained sample to the BCA

24

for DNA profiling, which would have connected the boy to the crime in question.

. . .

*If*, on the other hand, the boy and his mother had refused permission . . . , the police *presumably* would have sought and obtained a warrant . . . .

*J.W.K.*, 583 N.W.2d at 757 (emphasis added).

We are "extremely reluctant to overrule [our] precedent." *County of Hennepin v. Hollydale Land LLC*, 17 N.W.3d 457, 461 (Minn. 2025). But "we will not adhere to our former decisions if they are clearly and manifestly erroneous." *State v. Noor*, 964 N.W.2d 424, 435 (Minn. 2021) (citation omitted) (internal quotation marks omitted). *J.W.K.* is clearly in conflict with the inevitable discovery rule articulated in *Nix* and reiterated in *Diede*: "The State may not show inevitable discovery by claiming that if it had not searched illegally, it would have done so legally." *Diede*, 795 N.W.2d at 849. Accordingly, we overrule our decision in *J.W.K.*[9]

The dissent argues that applying the inevitable discovery exception here would be consistent with *Nix* because "[t]he record in this case—the 'demonstrated historical facts capable of ready verification'—firmly establishes that the State had ample grounds to obtain a search warrant for a buccal swab from Steeprock for comparison with DNA found

---

[9]    Although we do not overrule *Eppler* in its entirety, given our decision today, to the extent that decision purportedly relies on the inevitable discovery exception, it is no longer good law. Specifically, the speculative statement that "it appears inevitable that the police would have obtained a picture of [the defendant] through independent means, would have shown that picture to the eyewitnesses, and would have obtained the eyewitness identification evidence," *Eppler*, 362 N.W.2d at 317, is an incorrect application of the inevitable discovery exception.

on the handgun from the snowbank." The dissent observes that the State previously applied for a search warrant for DNA, "and a district court judge signed the search warrant." Thus, the dissent notes, "like *J.W.K.*, the discovery of Steeprock's DNA was inevitable in this case and the evidence was properly admissible at trial."

We reject this rationale as contrary to *Nix*. In *Nix*, the Supreme Court focused on historical facts regarding what the police were doing at the time of the illegal search and whether this additional investigation would have led to the discovery of the evidence through lawful means. 467 U.S. at 447–50. The historical facts in *Nix* showed that, while some police officers improperly interrogated the defendant regarding the location of a missing child's body, another officer simultaneously led a large-scale search in the area where the body was found. *Id.* at 449–50. Here, on the other hand, there are no historical facts showing that the State did anything to secure a search warrant after it agreed not to rely on the evidence it obtained pursuant to the earlier search warrant that was constitutionally challenged. That the State arguably *could have* obtained a second search warrant if it had made any effort to apply for one is not a historical fact. It is speculation. Thus, *Nix* does not support the dissent's reasoning.

On the other hand, our decision in *Diede* reflects the inevitable discovery rule as articulated in *Nix*. Applying *Diede* here, we conclude that the State cannot satisfy its burden of showing that Steeprock's DNA evidence would have been inevitably discovered. The sole argument that the State advances to support inevitable discovery is that it could have applied for a search warrant to obtain Steeprock's DNA but did not. Because the

26

exception does not apply under these circumstances, the State's argument fails. *See Diede*, 795 N.W.2d at 849.

B.

The good-faith exception to the exclusionary rule allows for the admission of illegally obtained evidence when investigators acted based on an objectively reasonable belief that their actions were lawful. *United States v. Leon*, 468 U.S. 897, 913, 918–19 (1984). We have held that the good-faith exception applies to "only one limited circumstance" under the Minnesota Constitution: when "law enforcement officers obtain evidence in reasonable reliance on binding appellate precedent that specifically authorizes the police conduct at issue." *Malecha*, 3 N.W.3d at 574 (citing *Lindquist*, 869 N.W.2d at 876). And we have declined to extend the exception to scenarios in which officers rely "in good faith on the basis of a neutral magistrate's authorization." *Garza v. State*, 632 N.W.2d 633, 639–40 (Minn. 2001).

The State urges us to apply the good-faith exception to the exclusionary rule here, arguing that Rule 9.02, subdivision 2(1)(f), is equivalent to binding appellate precedent because it is a rule of this court. *See* Minn. R. Crim. P. 9.02.

The State did not raise the good-faith exception before the district court. Generally, when a party fails to raise an argument below, it is forfeited on appeal. *Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996). Nonetheless, the court of appeals considered the State's good-faith exception claim and concluded that it did not apply in Steeprock's case. *Steeprock*, 10 N.W.3d at 699. Because the court of appeals considered the exception's applicability, we elect to consider it here. *See State v. Grunig*, 660 N.W.2d 134, 137

27

(Minn. 2003) (providing that a respondent can defend an underlying decision on alternative grounds "when there are sufficient facts in the record for the appellate court to consider the alternative theories, there is legal support for the arguments, and the alternative grounds would not expand the relief previously granted").

Even assuming without deciding that Rule 9.02, subdivision 2(1)(f), is equivalent to "binding appellate precedent," the rule does not specifically authorize warrantless collection of DNA via buccal swab. The rule expressly states that all discovery orders are "subject to constitutional limitations." Minn. R. Crim. P. 9.02, subd. 2(1)(f) ("On the prosecutor's motion, . . . the court before trial may, *subject to constitutional limitations*, order a defendant to . . . [p]ermit the taking of blood, hair, saliva, urine, or samples of other bodily materials that do not involve unreasonable intrusion . . . ." (emphasis added)). We therefore conclude that the good-faith exception to the exclusionary rule does not apply to the circumstances of this case.

In sum, because neither the inevitable discovery nor the good-faith exceptions to the exclusionary rule apply, the exclusionary rule required suppression of Steeprock's DNA. Thus, the DNA evidence should not have been admitted during Steeprock's trial.

Because the evidence was admitted at trial, we next consider the implication of this error.

C.

The admission of the DNA evidence at Steeprock's trial implicated his right under the federal and state constitutions to be free of unreasonable searches and seizures. When an error implicates a constitutional right, we must determine whether the error was

28

harmless beyond a reasonable doubt. *McNeilly*, 6 N.W.3d at 189. When an error was *not* harmless beyond a reasonable doubt, a new trial is required. *State v. Lee*, 929 N.W.2d 432, 440 (Minn. 2019). The State bears the burden to show that an error was harmless beyond a reasonable doubt. *State v. Johnson*, 915 N.W.2d 740, 745 (Minn. 2018).

An error is harmless beyond a reasonable doubt if the jury's verdict was "surely unattributable to the error." *Id.* (citation omitted) (internal quotation marks omitted). Stated differently, we must determine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Juarez*, 572 N.W.2d 286, 291 (Minn. 1997) (citation omitted) (internal quotation marks omitted). In cases involving the "erroneous admission of evidence, we consider the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, . . . whether it was effectively countered by the defendant," and "the strength of the evidence of guilt" when deciding if the error was harmless beyond a reasonable doubt. *State v. Sanders*, 775 N.W.2d 883, 888 (Minn. 2009) (citation omitted) (internal quotation marks omitted).

The court of appeals concluded that the district court's erroneous admission of Steeprock's DNA evidence was not harmless beyond a reasonable doubt, reasoning that the DNA evidence was "persuasive and central" because the State presented no other evidence or testimony connecting Steeprock to the scene of the shooting. *Steeprock*, 10 N.W.3d at 700. The court of appeals also noted that the State referenced the DNA evidence numerous times throughout closing arguments. *Id.*

29

We agree. The DNA evidence was a substantial component of the State's case. It was also highly damaging to the defense. The DNA evidence was strong evidence that Steeprock handled the gun that shot C.J. Not surprisingly, the prosecutor capitalized on the evidence. The prosecutor referenced the DNA evidence numerous times during closing argument. Steeprock attempted to counter the DNA evidence in his closing argument, highlighting that the gun contained a mixture of DNA from four or more individuals and that it was unclear where on the gun Steeprock's DNA was found. But on rebuttal, the prosecutor again emphasized the significance of the DNA evidence.

Because the DNA evidence was potent evidence of Steeprock's guilt and the State took full advantage of this during closing argument, we cannot conclude that the erroneous admission of the DNA evidence was harmless beyond a reasonable doubt. We therefore affirm the decision of the court of appeals reversing Steeprock's convictions and remanding for a new trial.

### III.

Because it is an issue that is likely to recur on remand, we next consider whether the district court abused its discretion when it denied Steeprock's motion to instruct the jury on the statutory requirement for corroboration of accomplice testimony. Steeprock argues that accomplice testimony includes out-of-court accusations introduced as substantive evidence against a defendant. According to Steeprock, the statements that A.C. made during her phone calls and in her texts were the equivalent of accomplice testimony. Given the amount and significance of this evidence, Steeprock contends that the district court's

30

failure to instruct the jury on the need for corroboration significantly impacted the verdict in his case.

Under Minnesota Statutes section 634.04, a defendant cannot be convicted of a crime based on uncorroborated accomplice testimony.[10] Minn. Stat. § 634.04 ("A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense . . . ."). Based on this statutory requirement, we have repeatedly held that district courts have a duty to instruct juries that accomplice testimony must be corroborated by independent evidence. *State v. Davenport*, 947 N.W.2d 251, 260 (Minn. 2020); *State v. Strommen*, 648 N.W.2d 681, 689 (Minn. 2002).[11]

The district court denied Steeprock's motion for an accomplice-corroboration instruction, determining that A.C.'s out-of-court statements were not "testimony" because they were not "given in court under oath." The court of appeals affirmed the district court's denial of the instruction based on this same reasoning. *Steeprock*, 10 N.W.3d at 704.

---

[10] An accomplice is someone who "could have been indicted and convicted of the same crime for which the defendant is charged." *State v. Cox*, 820 N.W.2d 540, 548 (Minn. 2012) (citation omitted) (internal quotation marks omitted). A.C. was charged with attempted first-degree premeditated murder for shooting C.J.

[11] The model jury instructions include an instruction about corroboration of accomplice testimony. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.18 (6th ed. Supp. 2022–2023) ("You cannot find the defendant guilty of a crime on the basis of the testimony of an accomplice unless that testimony is corroborated by other evidence that tends to convict the defendant of the crime. 'To corroborate' means to support or confirm." (footnote omitted)).

Before this court, Steeprock argues that the word "testimony" as used in section 634.04 is ambiguous because it has both common and technical meanings. He urges us to interpret the word to include out-of-court accusations made by an accomplice that are offered as substantive evidence against a defendant. The State responds that "testimony" is an unambiguous, technical legal term that applies only to statements made under oath.

We have never addressed whether the requirement for corroboration of accomplice testimony applies to an accomplice's out-of-court statements. However, we have addressed the need for corroboration of an accomplice's testimony in proceedings other than a defendant's trial. In *State v. Davenport*, we concluded that an accomplice's guilty-plea testimony, which was later admitted at the defendant's trial, was testimony. 947 N.W.2d at 262. We relied, in part, on the fact that the accomplice "gave his plea hearing testimony under oath during a court proceeding." *Id.*

To address Steeprock's argument, we must interpret the word "testimony" as used in section 634.04. We review questions of statutory interpretation de novo. *State v. Latino*, 15 N.W.3d 654, 658 (Minn. 2025). "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16; *see also Latino*, 15 N.W.3d at 658 (same). First, we "determine whether the language, on its face, is ambiguous." *State v. Robinson*, 921 N.W.2d 755, 758 (Minn. 2019). "Statutory language is ambiguous only if, as applied to the facts of the particular case, it is susceptible to more than one reasonable interpretation." *Latino*, 15 N.W.3d at 659 (citation omitted) (internal quotation marks omitted). If we determine that the statutory text is ambiguous,

we may apply the canons of construction to ascertain the intent of the Legislature and resolve the ambiguity. *Id.* at 660; *see* Minn. Stat. § 645.16. But "[i]f a statute is unambiguous, we apply the statute's plain meaning." *State v. Powers*, 962 N.W.2d 853, 858 (Minn. 2021).

Section 634.04 does not define "testimony." *See* Minn. Stat. § 634.04. When a statute does not define a term or phrase, we may look to dictionary definitions to determine the plain meaning. *See Shire v. Rosemount, Inc.*, 875 N.W.2d 289, 292 (Minn. 2016). While we "generally interpret statutory words according to their common meaning, . . . technical words and phrases . . . are construed according to [their] special meaning." *State v. Rick*, 835 N.W.2d 478, 484 (Minn. 2013) (alteration in original) (citation omitted) (internal quotation marks omitted), *abrogated on other grounds by*, *State v. Thonesavanh*, 904 N.W.2d 432 (Minn. 2017); Minn. Stat. § 645.08(1) ("[T]echnical words and phrases . . . are construed according to [their] special meaning or their definition . . . ."). "A word has a special meaning if courts have ascribed a well-established and long-accepted meaning to [it]." *Cox v. Mid-Minn. Mut. Ins. Co.*, 909 N.W.2d 540, 543 (Minn. 2018) (alteration in original) (citation omitted) (internal quotation marks omitted). "Whether a word should be ascribed a technical or special meaning depends in part upon the context in which the word appears." *Rick*, 835 N.W.2d at 484.

The context in which "testimony" appears is Minnesota Statutes chapter 634, which governs evidence and witnesses in legal proceedings. *See* Minn. Stat. ch. 634 (titled "Evidence; Witnesses"). Given that context, we determine that it is a technical legal term. Because it is a technical legal term that is used in a legal sense, we consider the definition

33

provided by a legal dictionary. *See Rick*, 835 N.W.2d at 484. Black's Law Dictionary defines "testimony" as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition." *Testimony*, *Black's Law Dictionary* (12th ed. 2024). On the basis of this definition, we conclude that "testimony" as it appears in Minnesota Statutes section 634.04 is unambiguous and refers only to statements made under oath.

Because "testimony" in section 634.04 refers only to statements made under oath, Steeprock was not entitled to an accomplice-corroboration jury instruction regarding the statements that A.C. made during her phone calls and in her texts. We therefore conclude that the district court did not abuse its discretion when it denied Steeprock's request for such an instruction.[12]

**CONCLUSION**

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

---

[12] Finally, Steeprock argues that the district court abused its discretion when it admitted specific out-of-court statements made by A.C. under the statement-against-interest exception to the hearsay rule. He argues that the erroneously admitted statements prejudiced the outcome of his trial.

The court of appeals declined to address the merits of this argument because it had already awarded Steeprock a new trial based on the unconstitutional search. *Steeprock*, 10 N.W.3d at 705. We likewise do not reach this issue for the same reason. But we reiterate the court of appeals' guidance to the district court on remand. Courts must "construe the term 'statement' narrowly and allow *only those statements that directly inculpate the declarant* and not admit a larger narrative that merely contains some inculpating statements," *State v. Tovar*, 605 N.W.2d 717, 723 (Minn. 2000) (emphasis added), especially when the declarant implicates someone else. *Williamson v. United States*, 512 U.S. 594, 601 (1994); *see also State v. Morales*, 788 N.W.2d 737, 764 (Minn. 2010) (calling for careful scrutiny of statements that incriminate another).

CONCURRENCE & DISSENT

McKEIG, Justice (concurring in part and dissenting in part).

The inevitable discovery doctrine is a well-established, longstanding exception to the general rule that evidence obtained in violation of the Fourth Amendment must be suppressed. *Nix v. Williams*, 467 U.S. 431, 447–48 (1984) (adopting the inevitable discovery exception). This exception allows evidence to be admitted at trial—even when it was discovered in an unlawful search—if the evidence would have inevitably been discovered by lawful means. *State v. Licari*, 659 N.W.2d 243, 254 (Minn. 2003); *State v. Harris*, 590 N.W.2d 90, 105 (Minn. 1999). Here, had the evidence in this case—a DNA profile from Steeprock—not been obtained through a Rule 9.02 order, it certainly would have inevitably been discovered through lawful means: a search warrant for a buccal swab. Because the inevitable discovery exception properly applies to this evidence, I respectfully dissent from parts I and II of the court's opinion.

To admit evidence under the inevitable discovery exception, the State must "establish by a preponderance of the evidence that the fruits of a challenged search 'ultimately or inevitably would have been discovered by lawful means.' " *Licari*, 659 N.W.2d at 254 (quoting *Nix*, 467 U.S. at 444). Rather than speculating on what the State might have done, the inevitable discovery exception "focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* (quoting *Nix*, 467 U.S. at 444 n.5). The rationale behind the inevitable discovery doctrine is that the prosecution should not be put in a worse position by excluding the illegally obtained evidence because police officers

would have otherwise obtained the evidence legally. *In re Welfare of J.W.K.*, 583 N.W.2d 752, 756 (Minn. 1998) (citing *Nix*, 467 U.S. at 443–44).

In *J.W.K.*, we applied the inevitable discovery exception to allow admission of DNA evidence at trial obtained from the defendant's blood sample that was tested without his consent or a warrant. *Id.* at 757. Police officers initially suspected the defendant was involved in a destruction of property incident and obtained consent to draw his blood to test it against DNA evidence found at the scene. *Id.* at 753–54. Officers did not end up testing the defendant's blood in connection with the property destruction case but kept the sample. *Id.* at 754. After learning that the defendant was a suspect in an unrelated burglary, officers had the defendant's blood sample tested against DNA evidence found at the burglary scene instead. *Id.* Officers did not obtain a warrant or consent to test the sample in connection with the burglary. *See id.* The defendant's DNA matched DNA evidence from the burglary scene and, after officers confronted him with this information, the defendant confessed. *Id.* We held that the inevitable discovery exception allowed admission of the DNA evidence at the defendant's trial. *Id.* at 757. Considering the purposes of the exclusionary rule and the inevitable discovery exception, we reasoned that, had the officers not submitted the blood sample for testing in connection with the burglary, they presumably would have either obtained permission of the defendant or obtained a warrant given that there was probable cause. *Id.*

The same rationale applies here with even greater force: Had the officers not obtained Steeprock's DNA through the Rule 9.02 order, the State would have undoubtedly obtained his DNA through a search warrant for a buccal swab. At the time of the State's

Rule 9.02 motion, the record indicates the State had ample probable cause to obtain a search warrant. The court argues that there "are no historical facts showing that the State did anything to secure a search warrant after it agreed not to rely on the evidence it obtained pursuant to the earlier search warrant that was constitutionally challenged."[1] The court concludes that it is "speculation," and "not a historical fact," "[t]hat the State arguably *could have* obtained a second search warrant if it had made any effort to apply for one."

But—as the court notes—as part of the investigation, investigators *had* previously applied for a search warrant under predictable police investigatory procedures to obtain buccal swabs from Steeprock for DNA testing, and a district court judge signed the search warrant. This is not a case where the process of obtaining a search warrant had barely begun or the likelihood of officers presenting an application for a warrant was entirely speculative. While the court concludes that the State "*could have* obtained a second search warrant," I conclude that the State *would have* obtained a second search warrant.

The record in this case—the "demonstrated historical facts capable of ready verification"—firmly establishes that the State had ample grounds to obtain a search warrant for a buccal swab from Steeprock for comparison with DNA found on the handgun from the snowbank. The facts alleged in the complaint established that the victim was shot eight or nine times, likely by two different firearms. The complaint established that Steeprock was present at the scene of the murder and that a firearm was found in the snow

---

[1] The earlier search warrant was only challenged; no determination of its constitutionality was made.

where Steeprock was apprehended. The State's Rule 9.02 motion stated that forensic testing showed that the firearm found near Steeprock when he was arrested fired eight of the discharged cartridge casings found at the scene. Finally, the State's motion indicated that DNA had been recovered from this firearm. As such, like *J.W.K.*, the discovery of Steeprock's DNA was inevitable in this case and the evidence was properly admissible at trial. Indeed, the facts of this case demonstrating that the evidence would have been inevitably discovered by lawful means are far more compelling than those in *J.W.K.*, where we applied the inevitable discovery doctrine. Here, I would conclude the State indisputably met its burden to establish by a preponderance of the evidence that Steeprock's DNA would have inevitably been discovered by lawful means.

Rather than follow the principles we announced in *J.W.K.*, the court overrules the case to fit with its view of the inevitable discovery exception. "Under the principle of *stare decisis*, we are reluctant to overrule our precedent unless there is a *compelling reason* to do so." *State v. Buchan*, 993 N.W.2d 614, 622 (Minn. 2023) (emphasis added) (citing *Wheeler v. State*, 909 N.W.2d 558, 565 (Minn. 2018)). I find no compelling reason to overrule our precedent in *J.W.K.*[2] Even more concerning, the court also overrules our decision in *State v. Eppler*, 362 N.W.2d 315 (Minn. 1985), which we relied on in *J.W.K.*, to the extent that case discusses the inevitable discovery exception. Both *J.W.K.* and

---

[2]    Even if the court believes that the reasoning in *J.W.K.* was speculative—contrary to *Nix*—no such concern is present here. The facts supporting the conclusion that the discovery of the DNA evidence was inevitable are not speculative but rather supported by the record in this case.

*Eppler* rely on longstanding precedent from the U.S. Supreme Court on the inevitable discovery exception. *Nix*, 467 U.S. at 448–49; *J.W.K.*, 583 N.W.2d at 756 (discussing *Nix*); *Eppler*, 362 N.W.2d at 317 (discussing *Nix*); *see also Licari*, 659 N.W.2d at 254–56 (remanding to the district court for further findings on inevitable discovery based on *Nix*); *Harris*, 590 N.W.2d at 105 (citing *J.W.K.* and *Nix* in applying the inevitable discovery exception). The court ignores both our own reasoning in prior cases and longstanding precedent from the U.S. Supreme Court in holding that the inevitable discovery exception does not apply in this case.

Instead, the court relies on *State v. Diede*, 795 N.W.2d 836 (Minn. 2011), to hold that the inevitable discovery exception does not apply. In *Diede*, we concluded that the inevitable discovery exception did not apply to the facts of that case. *Id.* at 849–50. A detective was conducting surveillance on an individual (Hanson) when they observed Hanson and Diede driving in a gray Chevrolet truck. *Id.* at 840–41. The officer followed the truck and discovered the license plate was registered to a red Mazda truck, not a gray Chevrolet. *Id.* at 841. When the truck stopped at Diede and Hanson's shared trailer home, the detective saw Hanson open the passenger door and appear to toss something into the back of the truck. *Id.* The detective arrested Hanson and began to question Diede. *Id.* Eventually a special agent who later arrived on the scene asked Diede to empty her pockets, and police found methamphetamine in her possession. *Id.* at 841–42. The district court concluded that police had reasonable articulable suspicion to seize Diede largely based on Hanson's behavior and events that occurred after the initial seizure. *Id.* at 843. We held that the district court erred in determining that police had reasonable articulable suspicion

that Diede was engaged in drug-related activity at the time she was seized because there was no objective basis for such suspicion. *Id.* at 844. We further held that the inevitable discovery exception did not apply because "[t]he State showed no reason . . . why it would inevitably have discovered the methamphetamine." *Id.* at 849.

The facts of *Diede* are entirely distinguishable from the present case. Had police not illegally seized Diede, the State did not show a basis for officers to otherwise lawfully search her and, as a result, discover the methamphetamine. As such, we did not reject or narrow the inevitable discovery doctrine in *Diede* but merely concluded that the State "did not meet its burden" to show by a preponderance of the evidence that it would have inevitably discovered the evidence through lawful means. *Id.* at 850. By contrast, here, the State would have certainly obtained a warrant for Steeprock's DNA had it not obtained the DNA through the Rule 9.02 order. As described above, the State had ample probable cause to obtain a search warrant. And, as the court notes in its harmless error analysis, Steeprock's DNA was a crucial part of the State's case as the only direct evidence connecting Steeprock to the crime. It is not "speculation" to say that the State would have obtained a warrant; rather, it is inevitable that the State would have pursued a search warrant to obtain Steeprock's DNA because the DNA evidence was crucial in the case against Steeprock.

The court's reasoning suggests that *J.W.K.* and *Diede* are in conflict with one another, when in reality both cases can, as they have for decades, exist simultaneously in our jurisprudence. They are easily distinguishable on their facts. Because I would not overrule *J.W.K.* and the facts presented here are analogous—and even *more*

compelling—to the facts of *J.W.K.,* I would affirm the admission of the DNA evidence at Steeprock's trial based on the inevitable discovery exception. I agree with the State that justice is not served by reversing Steeprock's conviction, requiring officers to obtain a search warrant and new DNA testing, and proceeding with a new trial using precisely the same DNA evidence that the State used in the first trial.

I am also concerned about what overruling *J.W.K.* will mean for subsequent cases relying on the inevitable discovery exception. For example, the court of appeals recently upheld the admission of DNA evidence in another Rule 9.02 case based on the inevitable discovery exception where the district court explicitly told the parties that it would have granted a warrant on the same facts as the Rule 9.02 order. *See State v. Babineaux*, No. A24-1073, 2025 WL 1793655, at *3–5 (Minn. App. June 30, 2025). But, under the court's opinion, even this explicit statement from the district court would likely not be enough to apply the inevitable discovery exception. Under the extraordinarily high standard for the inevitable discovery doctrine adopted by the court today, I cannot see how the State would ever be able to meet its burden to show by a preponderance of the evidence that illegally-obtained DNA evidence—which, like here, is often critical to the State's case—would have been inevitably discovered through lawful means.

Because I would reverse the decision of the court of appeals and hold that the inevitable discovery doctrine applies, I would affirm Steeprock's conviction for both attempted first-degree premeditated murder and unlawful possession of a firearm. I therefore respectfully dissent as to parts I and II of the court's opinion.

MOORE, III, Justice (concurring in part and dissenting in part).

I join the opinion of Justice McKeig concurring in part and dissenting in part.